315 F.2d 828
 UNITED STATES of America, Appellant,
v.
Howeth M. MILLS and Crawford Mills, as individuals, and Howeth M. Mills and Crawford Mills, d/b/a Mills Dairy Products Company, a co-partnership, Appellees.
UNITED STATES of America, Appellant,
v.
WILLOW FARMS DAIRY, INC., Appellee.
UNITED STATES of America, Appellant,
v.
Brice G. TWILLEY, individually, and Brice G. Twilley, d/b/a Twilley's City Dairy, Appellee.
UNITED STATES of America, Appellant,
v.
Nesbit C. MURPHY, individually, and Nesbit C. Murphy, d/b/a Shiloh Dairy Farms, Appellee.
Howeth M. MILLS and Crawford Mills, individually and as co-partners, d/b/a Mills Dairy Products Company, a co-partnership, Nesbit C. Murphy, an individual, d/b/a Shiloh Dairy Farms, and Brice G. Twilley, an individual d/b/a Twilley's City Dairy, Appellees,
v.
Orville L. FREEMAN, Secretary of Agriculture, Appellant.
WILLOW FARMS DAIRY, INC., and Kenneth Barrick, et al., Intervening Plaintiffs, Appellees,
v.
Orville L. FREEMAN, Secretary of Agriculture, Appellant.
UNITED STATES of America, Appellant and Cross-Appellee,
v.
ROYAL FARMS DAIRY, INC., Wilton Farm Dairy, Inc., and W. S. Hebb and Lorraine D. Hebb, co-partners, d/b/a Aristocrat Dairy, Appellees and Cross-Appellants.
 Nos. 8774-8779.
 No. 8849.
 United States Court of Appeals Fourth Circuit.
 Argued January 10, 1963.
 Decided March 11, 1963.
 
 Richard S. Salzman, Atty., Dept. of Justice (Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Joseph D. Tydings, U. S. Atty., Alan S. Rosenthal, Atty., Dept. of Justice, Neil Brooks, Asst. Gen. Counsel, and J. Charles Krause and Joseph A. Walsh, Attys., Dept. of Agriculture, on brief), for appellants U.S. and Orville L. Freeman.
 Charles G. Page, Baltimore, Md. (White, Page & Lentz, Baltimore, Md., on brief), for appellees Willow Farms Dairy, Inc., Kenneth Barrick and others.
 Robert F. Skutch, Jr., Baltimore, Md. and Ben Ivan Melnicoff, Washington, D. C. (Weinberg & Green, Baltimore, Md., on brief), for appellees Mills, Twilley and Murphy and others.
 Before SOBELOFF, Chief Judge, and BRYAN, Circuit Judge.
 ALBERT V. BRYAN, Circuit Judge.
 
 
 1
 A Federal Milk Marketing Order for the Upper Chesapeake Bay Area, including Baltimore, was struck down by the District Court at the suit of four dairies located within this part of Maryland but outside the City. The United States appeals, contesting the fatal infirmities found by the Court in the Order. The suit, we think, should not have succeeded.
 
 
 2
 The Order in question, designated as No. 127, was issued under the Agricultural Marketing Agreement Act of 1937 (reenacting and amending the Agricultural Adjustment Act, 1935) as amended, 7 U.S.C. § 601 et seq.* It regulated the marketing of milk in Baltimore, in all the counties on the Eastern Shore and in several on the west of Chesapeake Bay adjacent to Baltimore. Pursuant to the Act the Order fixed minimum prices to the farmers — known as producers — for milk purchased from them by dairies — known as handlers — selling fluid milk in the marketing area. The necessity of milk regulation, as well as the modus operandi of a Milk Order, has been fully explained in United States v. Rock Royal Co-op., 307 U.S. 533, 542-550, 571, 59 S.Ct. 993, 83 L.Ed. 1446 (1939) and, as its general structure and operation are not now in controversy, no further exposition is requisite. Likewise the interstate nature of the milk operations here is not questioned.
 
 
 3
 The Act seeks "to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish, as the prices to farmers, parity prices * * *." § 602(1). For definition of "parity prices" it refers to the Agricultural Adjustment Act, 7 U.S.C. § 1301(a), prescribing an arithmetical method of their computation. Generally, it is the price which would give farm commodities the purchasing power approximating what they possessed from 1910 to 1914, the years just before World War I. This aim of the statute is to be achieved through "the exercise of the powers conferred upon the Secretary of Agriculture" by the Act, which also made stipulations for the protection of the consumer. The instrument afforded the Secretary to accomplish the purpose was an agreement with the farmers and handlers of a selected area or, failing agreement then an order of the Secretary, establishing in the area minimum prices for sales by producer to handler.
 
 
 4
 In the present case no agreement was obtained and the Secretary promulgated the price order before us. Effective January 1, 1960, it was based upon conditions canvassed in August 1959. It classified milk, as required by the statute, according to the form or purpose for which it was to be used: Class I covering milk sold for fluid use and Class II for that to be manufactured into other dairy products. § 608c(5). The minimum prices fixed per hundredweight were: $5.10 for Class I in the months of March through June, and $5.55 from July through February, and a lower figure for Class II set according to a stated formula.
 
 
 5
 Vitiation of Order 127 was placed by the District Court upon the following premises:
 
 
 6
 (1) That the Secretary in establishing the Order failed to "find", but merely "ascertained", the parity price of milk — and even then the national, not the local figure — and failed to show the process of the adjustment of it to the minimum prices fixed by the Order;
 
 
 7
 (2) That the referendum among the producers required by the Act upon the question of whether an Order should be promulgated was illegal because the Secretary unduly restricted the eligibility of the voters; and
 
 
 8
 (3) That the marketing area fixed by the Order embraces rural counties along with the City to the detriment of the county handlers.
 
 
 9
 I. Before issuing an order in respect to milk or its products, the Act demands that the Secretary "ascertain the parity prices of such commodities". It then declares that the parity prices called for in the Act's recital of Congressional purpose, noted ante, shall "be adjusted to reflect the price of feeds, the available supply of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area to which the contemplated * * * order * * * relates". Further, if "the Secretary finds, upon the basis of the evidence adduced [at the administrative hearing preliminary to the promulgation of the order] * * * that the parity prices of such commodities are not reasonable in view of the price of feeds, the available supply of feeds, and other economic conditions * * *, he shall fix such prices as he finds will reflect such factors * * * and be in the public interest". § 608c (18).
 
 
 10
 No evidence, concededly, was taken by the Secretary in the administrative proceedings relating to the parity price and on that point he made no "finding". But he did "ascertain" the parity price: $4.93 for August and the remainder of 1959 except $4.91 in October. This was done by calculation under the formula set forth in the Agricultural Adjustment Act, 7 U.S.C. § 1301(a) (1) to which, as already mentioned, the Marketing Act refers for definition of parity price. In this reckoning he had access to "Agricultural Prices", an official monthly publication of the Department of Agriculture giving parity prices, average prices paid for feeds and other economic factors. The bulletin apparently is generally known by farmers and dairymen.
 
 
 11
 Entire compliance with the Act, we think, appears of record in this case. After stating the formula, § 1301(a) (1) continues:
 
 
 12
 "(D) The prices and indices provided for herein, and the data used in computing them, shall be determined by the Secretary, whose determination shall be final."
 
 Following is § 1301(c):
 
 13
 "The latest available statistics of the Federal Government shall be used by the Secretary in making the determinations required to be made by the Secretary under this chapter."
 
 
 14
 "Parity price" is thus an official Government figure and the Secretary is commanded to adopt it. In this view, no evidence was appropriate in its determination. In the absence of some indication that the parity intended by the Act was a local price, we have no reason to think so. This is confirmed by such legislative history as we find on § 608c(18), supra — the section requiring the ascertainment of parity price — which was brought into the Act by amendment in 1937. The House Report thereon reads:
 
 
 15
 "* * * The proposed amendment recognizes this, and provides that if the Secretary finds that the national parity price for milk does not adequately reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand for milk in the marketing area to which the marketing agreement or order relates, he shall fix such prices as will reflect such factors, insure a sufficient quantity of pure wholesome milk, and be in the public interest." [Accent added.] H.R. Rep. No. 468, 75th Cong., 1st Sess. (1937)
 
 
 16
 The Senate Report rather joins the House Report in the thought that local situations were to be satisfied by trimming or increasing the parity prices through consideration of local conditions. This strongly implies that the parity price to begin with is the national figure. S.Rep. No. 565, 75th Cong., 1st Sess. (1937).
 
 
 17
 But parity price, whether national or local, is only the starting point of a progression to minimum prices, merely a referable figure and in no sense final. Although, as heretofore noticed, the policy statement in the Act, § 602(1), adverts to "parity prices" as the desideratum which the Act seeks to establish and maintain for farmers, § 608c(18) clearly demonstrates that the ultimate object of the legislation is to set reasonable prices. The parity price is a consideration but, whatever the figure, it must be adjusted in the light of the price of feeds and the other factors just quoted from § 608c(18). Reasonable price, not parity price, is what the Secretary must "find".
 
 
 18
 He has done this in § 1027.0(a) (2) of the Order:
 
 
 19
 "The parity prices of milk as determined pursuant to section 2 of the Act are not reasonable in view of the price of feeds, available supplies of feeds, and other economic conditions which affect market supply and demand for milk in the said marketing area, and the minimum prices specified in the order are such prices as will reflect the aforesaid factors, insure a sufficient quantity of pure and wholesome milk and be in the public interest;"
 
 
 20
 True, this is a paraphrase of § 608c(18), but it has firm basis in the record. In arriving at this determination, the Secretary had before him in the promulgation hearing evidence of the cost of feed, wage rates, demand and deliveries of milk, both nationally and in Maryland, as well as comparisons of related items in adjacent regulated areas, all covering an expanse of several years. In his decision the Secretary looks for "adequate but not excessive supplies" of milk. At considerable length he discusses relevant conditions in the Washington, D. C., Philadelphia and New York-New Jersey markets, concluding the section of his decision on prices with a clear indication that he had in mind "cost factors affecting the supply and demand for milk".
 
 
 21
 Therefore, it cannot be justly said that the Secretary's finding of parity price or of adjusted or reasonable price was procedurally faulty and not resting on substantial evidence.
 
 
 22
 II. The point next made to invalidate the Order relates to the requirements of electors in the referendum on the adoption of the Order. The District Court agreed with the appellee dairies that the eligibility rules imposed by the Secretary were illegal in not permitting all producers to vote.
 
 
 23
 Before a Milk Order may be issued the Secretary must, under the Act, give due notice of a hearing upon the proposed Order. At such hearing — known as the promulgation hearing — evidence may be introduced in respect to the need for the order. § 608c(3). If then the Secretary finds that the issuance of an order "will tend to effectuate the declared policy" of the Act, he shall issue it. § 608c(4). But when, as here, the handlers have failed to agree to it, no order can become effective unless and until the Secretary determines that the failure would tend to prevent attainment of the declared policy of the Act, that the order is the only practical way of advancing the interest of the producers, and that the order is approved:
 
 
 24
 "(i) By at least two-thirds of the producers * * * who, during a representative period determined by the Secretary, have been engaged, within the production area specified in such marketing agreement or order, in the production for market of the commodity specified therein, or who, during such representative period, have been engaged in the production of such commodity for sale in the marketing area specified in such marketing agreement, or order, or
 
 
 25
 "(ii) By producers who, during such representative period, have produced for market at least two-thirds of the volume of such commodity produced for market within the production area specified in such marketing agreement or order, or who, during such representative period, have produced at least two-thirds of the volume of such commodity sold within the marketing area specified in such marketing agreement or order." § 608c(9) (B).
 
 
 26
 For the purpose of the referendum producer was defined in the Order in this way:
 
 
 27
 "(e) `Producer' means any dairy farmer, except * * * a dairy farmer for other markets, who produces milk which is received at a pool plant or is diverted to a nonpool plant during any month(s) of March through August or on not more than 8 days (4 days in the case of every-other-day delivery) during any month(s) of September through February: Provided, That the milk so diverted shall be deemed to have been received by the diverting handler at a pool plant at the location from which it was diverted"; § 1027.2(e),
 
 
 28
 and "who, during the representative period [August 1959], were engaged in the production of milk for sale within the aforesaid marketing area." Obviously the qualifications set forth in the Order do narrow the reference in the statute to those persons who must approve the order — the "producers". But the statute itself contains no definition of "producer". Therefore, we think the Secretary had the right to define "producer", and to fit the qualifications of the producer-voter, according to the proposition on referendum. H. P. Hood & Sons v. United States, 307 U.S. 588, 597-598, 59 S.Ct. 1019, 83 L.Ed. 1478 (1939); United States v. Wrightwood Dairy Co., 127 F.2d 907, 911 (7 Cir., 1942).
 
 
 29
 The Order in question dealt only with fluid milk received at, or diverted from, a pool plant as such a plant was described in the Order. All producers making such deliveries were made eligible to vote. True, the definition in the Order did by its terms exclude some farmers who produced milk for sale generally in the respective periods and in the marketing area, and so literally were within the statutory provision for a referendum. But those producers who did not deliver to pool plants in the area were not directly touched by the Order, and hence were not deprived of a substantial right by the Secretary's definition of a voter. The tally was 1663 in favor of the Order, 192 against. No rejection of even one proffered ballot has been shown. In sum, we think the Secretary did not misconstrue the Act.
 
 
 30
 The creation of a marketing area, it cannot be overstressed, does not inhibit a producer located within the area from selling his milk elsewhere. He need not associate himself with the geographical market of his residence or dairy. The Order rules him only if and when he participates in the local market.
 
 
 31
 III. Inclusion with the City of Baltimore of counties outside of its limits in constituting the marketing area of the Order is attacked by the appellee dairies — all located beyond the city limits — as unwarranted and prejudicial. Their argument is that they are not a part of the Baltimore community, that they had no milk problem, that it existed alone in the City of Baltimore and that the only farmers and handlers involved in the problem were those serving Baltimore. With this position we cannot agree.
 
 
 32
 The problem in milk marketing is clearly stated in United States v. Rock Royal Co-op., supra, 307 U.S. 533, 549-550, 59 S.Ct. 993, 1001-1002, 83 L.Ed. 1446:
 
 
 33
 "The problems concerned with the maintenance and distribution of an adequate supply of milk in metropolitan centers are well understood by producers and handlers. * * * It is generally recognized that the chief cause of fluctuating prices and supplies is the existence of a normal surplus which is necessary to furnish an adequate amount for peak periods of consumption. This results in an excess of production during the troughs of demand. As milk is highly perishable, a fertile field for the growth of bacteria, and yet an essential item of diet, it is most desirable to have an adequate production under close sanitary supervision to meet the constantly varying needs. * * * Since all milk produced cannot find a ready market as fluid milk in flush periods, the surplus must move into cream, butter, cheese, milk powder and other more or less nonperishable products. Since these manufactures are in competition with all similar dairy products, the prices for the milk absorbed into manufacturing processes must necessarily meet the competition of low-cost production areas far removed from the metropolitan centers. The market for fluid milk for use as a food beverage is the most profitable to the producer. Consequently, all producers strive for the fluid milk market. * * *"
 
 
 34
 Without regulation in a metropolitan center, experience showed that the competition to sell milk for fluid use became so intense that it led to violence as well as economic distress to the farmers, with dangerous disruption of the marketing of milk. Nebbia v. New York, 291 U.S. 502, 516-518, 54 S.Ct. 505, 78 L.Ed. 940 (1934).
 
 
 35
 In the present case, after deciding as a result of the promulgation hearing that a Milk Order was necessary in and around Baltimore, the Secretary laid out the Upper Chesapeake Bay Marketing Area and embraced in it not only Baltimore but nine counties on the Eastern Shore — that is, on the far side of Chesapeake Bay from Baltimore — five entire counties on the Western Shore adjacent to Baltimore, and portions of two others. In sketching these boundaries the Secretary obviously concluded that the area met the approved test: it was a practical homogeneous territory of control, fairly encompassing the Baltimore milkshed. Cf. United States v. Rock Royal Co-op., supra, 307 U.S. 533, 576, 59 S.Ct. 993, 83 L.Ed. 1446. This conclusion we think has not been proved wrong.
 
 
 36
 Fighting the placement of counties with Baltimore, the appellee dairies first point out that they do not, and by virtue of a city ordinance they cannot, sell milk in Baltimore, and so should not be tied into its market. The validity of such a municipal law is questionable. Dean Milk Co. v. Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951); Supplee-Willis-Jones Milk Co. v. Huntington Williams, decided July 9, 1956 by the Baltimore City Circuit Court. Actually, however, it does not appear that these county dairies ever tried to enter Baltimore or, indeed, wished to do so.
 
 
 37
 That milk-wise the City and the counties have a community interest has been clearly established. In 1959 in excess of 50% of the fluid milk dispensed on the Eastern Shore came from the City dairies. A subsequent investigation in 1961 showed that almost 80% of the total distribution on the Eastern Shore was furnished from Baltimore. Furthermore, a major part of the milk sold by producers on the Eastern Shore for fluid use was purchased by the Baltimore companies. As to the Western Shore counties, the Secretary found that there the greater part of the fluid milk commerce was carried on by the Baltimore handlers. Combination of counties with a metropolitan city is not irregular. The Milk Order considered in United States v. Rock Royal Co-op., supra, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446, brought together New York City and three nearby counties.
 
 
 38
 Again, the entire marketing area delineated by Order 127 is largely constituted of producers having a common interest. They are present throughout the territory. The bond is evidenced by their organization into the Maryland Co-operative Milk Producers Association, Inc. (Co-op). It has a membership of 1800 farmers and sells about 75% of all the milk sold in Baltimore.
 
 
 39
 The assertion by the appellee dairies that they have no problem and should not, therefore, be covered by the Order, is not altogether correct in premise or sound in conclusion. The record shows that the Co-op initiated the movement that culminated in the Order. It shows, too, that producers in the area, including the Co-op, had endeavored to market their milk without the aid of an order. The Secretary has found that this endeavor was not a success. Although the Co-op had sought to maintain fair prices to the farmers through agreements with handlers, this had failed and the stability of the milk market was seriously threatened. The Secretary's decision states, after exploring and expounding the cause of the disruption, that:
 
 
 40
 "It is concluded that the issuance of a marketing agreement and order for the Upper Chesapeake Bay marketing area is necessary to re-establish market stability and assure a continuing adequate supply of pure and wholesome milk for the market * * *."
 
 
 41
 While the appellee dairies may not have been affected by the market disturbance described by the Secretary, there is no reason to think they would not be in the future and that Order 127 did not in some measure prevent the dairies from feeling the disturbance. This is true because undoubtedly all the area milk prices had in the past been reflective of the Co-op price; they had been geared to Co-op's. In any event, the Secretary had to view the situation as a whole and deal with it as an entirety. In the circumstances we are not willing to say that the Secretary was clearly mistaken in his determination that appellees' marketing operations ought to be included with those handlers and producers contributing to the Baltimore market supply.
 
 
 42
 IV. Attacks on the Order other than those just discussed as urged before the District Court are made in this appeal by the appellee dairies and their intervening farmer-producers. The first is that the Examiner, with the subsequent approval of the Judicial Officer, refused to admit evidence offered by the dairies in the administrative proceeding, on their petition under § 608c(15) (A), seeking rescission of the Order by the Secretary. In this ruling we perceive no error.
 
 
 43
 This section of the Act contemplates a review of the correctness of the Order in law. It does not afford a de novo trial. Relief may be asked solely on the ground that the Order "is not in accordance with law". Obviously, such a review is based upon the record made and concluded in promulgation of the Order. No additional proof is permissible; the Order must stand or fall upon the proof and findings there. Beatrice Creamery Co. v. Anderson, 75 F.Supp. 363, 367 (D.Kan.1947). See Ogden Dairy Co. v. Wickard, 157 F.2d 445, 447 (7 Cir., 1946), cert. denied, 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1276 (1947); Bailey Farm Dairy Co. v. Jones, 61 F.Supp. 209, 217 (E.D.Mo.1945), aff'd, 157 F.2d 87 (8 Cir.), cert. denied, 329 U.S. 788, 67 S.Ct. 355, 91 L.Ed. 675 (1946); Queensboro Farm Prod., Inc. v. Wickard, 47 F. Supp. 206, 210 (E.D.N.Y.1942), aff'd, 137 F.2d 969 (2 Cir., 1943). To allow evidence would be to reopen, rather than to judge, the promulgation proceeding.
 
 
 44
 Another attack is directed at the status given by the Order to Co-op and to H. E. Koontz Creamery, Inc. (Koontz) in respect to its manufacturing and supply plant located in Westminster, Maryland. Koontz is also a Baltimore handler but the grievance, and our discussion, here is confined to its Westminster plant, some 30 miles from the city. Both Co-op and Koontz are classified as pool plant handlers — as explained presently — and this, say the dairies, unfairly confers upon them the protection given handlers by the Order when the Co-op is in actuality a producer only and Koontz a manufacturer of Class II milk rather than a bottler. This plaint involves the whole design of milk-marketing regulation.
 
 
 45
 In effectuation of the policy of the Act, under the Order the Secretary fixes minimum prices to be paid the farmers for their milk according to the use to which it is devoted, that is: Class I for fluid use and Class II for manufacture, as we have already outlined. Thereafter the proceeds of the sales of both classes are ordered pooled, and that total then divided by the quantity of all milk sold. The result is to give an average, between the Class I and the lower Class II price, known as the "blend" price. This is the price to be paid each farmer for his milk regardless of the use to which it has been put.
 
 
 46
 To operate this plan, the Order establishes pool plants. These are simply the plants of the handlers regulated by the plan. Each handler must pay the producer at the rate of the minimum price fixed by the Secretary for each class of milk. This the handler does by paying the farmer the blend price. However, as all the handlers cannot use all their milk in fluid form, the Order creates a means of equalization among them known as the settlement fund. It protects each handler by assuring reimbursement to the extent the handler has paid its farmers, through the blend price, more than the milk was worth to it.
 
 
 47
 The fund works in this way. Each handler which has used its milk as Class I, and so received a greater value for it than it paid the farmer, pays this excess into the settlement fund. The handler who has used its milk as Class II, and so received a lesser value for the milk than it paid the farmer, may then draw its reimbursement from the fund. This discussion omits, as immaterial here, reference to certain charges made against the handler and producer to cover the cost of operating the fund. It is plain that the settlement fund is merely a means of evening handlers' outlays for milk.
 
 
 48
 The first grievance of the appellee dairies — that the Co-op is made a handler — is that the Order thereby allows Co-op to draw upon the settlement fund into which they have paid. In practice it withdraws far more than any other handler, except sometimes Koontz, and if Co-op were merely a producer it could never draw thereon. In addition the complaint is that Co-op is permitted, as a handler, to divert milk into non-pool plants — not regulated by the Order and principally manufacturing facilities — with the result that it receives lower prices and thereby builds up its demand on the settlement fund.
 
 
 49
 This situation was closely scrutinized by the Secretary before shaping the Order. Foremost it must be kept in mind that no matter how much Co-op takes from the settlement fund, neither this fact nor the Order requires the appellee dairies to pay the producer at any rate above the minimum prices set by the Order. Furthermore, the Co-op absorbs for the most part the whole obligation of providing reserve or standby milk for Baltimore. It also disposes of all Class II milk for its large membership. Obviously these circumstances furnish ground for constituting the Co-op a handler. The Co-op would not, of course, by preference and through diversion sell its milk at lower prices than it could possibly obtain, for this would mean a diminution of the blend price and so reduction of the amount to be paid its members. We think the Secretary was not without ground for his classification of the Co-op.
 
 
 50
 It must be recalled that the Order is principally for the economic protection of producer and consumer, that the Co-op is actually its farmers, and that, so long as another handler is not unjustly treated, the Order may be drawn to enhance the position of the producer. "If the Act and Order are otherwise valid, the fact that their effect would be to give cooperatives a monopoly of the market" is not objectionable. United States v. Rock Royal Co-op, supra, 307 U.S. 533, at 560, 59 S.Ct. 993, at 1006-1007, 83 L.Ed. 1446.
 
 
 51
 The accusation against the Order in respect to Koontz is the same as that directed at Co-op but is premised on Koontz' odd posture. At Westminster, Koontz does not deal in the sale of Class I milk; it is primarily a manufacturer. Hence it is not there a handler as ordinarily understood in the Order — it has no pool plant for fluid milk. Nevertheless the Order accords Koontz the character of a handler, and as such it participates in the settlement fund as a drawer. It is at this the appellee dairies take offense.
 
 
 52
 Of course Koontz-Westminster is in an anomalous position. But the Secretary found, and we think on ample ground, that it is a justified anomaly. Carefully considering the part played by Koontz in the milk market, he found that it performed a highly valuable function. Its plant at Westminster serves as a storage place for the milk of the Co-op farmers pending its disposition, and Koontz also provides an outlet for Class II milk in its manufactory. If it is not classed as a pool plant, each farmer will have to build his own bulk storage tank at considerable expense. Taking into consideration all of these features, the Secretary cannot be said to be arbitrary in allowing Koontz to be a handler.
 
 
 53
 The standing of the appellee dairies to raise and press the last two objections is quite questionable. These relate to the operation of the settlement fund, which in no wise affects parity or minimum prices. United States v. Rock Royal Co-op., supra, 307 U.S. 533, at 560, 59 S.Ct. 993, at 1006-1007, 83 L.Ed. 1446. The handler is not hurt unless it is required to pay an unreasonable price for its milk. That is not alleged by appellees. No substantial harm to them is demonstrated in these objections but we have passed upon them, as apparently did the District Court, to avoid later uncertainty or litigation about the points.
 
 
 54
 After all, the Secretary must look at the area with a wide and comprehensive perspective. He has before him the entire output of milk in the area, and he must search for the best ways and means for its disposition. Aware of the annual consumption and distribution of fluid milk, he must arrange to channel the residue into outlets the most advantageous to the producer and consumer. He fashions his order accordingly. Of course, there may be some resultant damage to a handler or producer in the enforcement of the Act but this lack of perfection does not destroy the validity of the Order. The constitutionality of the Act is no longer questionable. United States v. Rock Royal Co-op., supra, 307 U.S. 533, 568-581, 59 S.Ct. 993, 83 L.Ed. 1446. Absolute equality is not demanded to sustain the operation of the Order. If the Secretary cannot "produce complete equality, for the variables are too numerous", he "fulfills his role when he makes a reasoned" Order. Mitchell v. Budd, 350 U.S. 473, 480, 76 S.Ct. 527, 531-532, 100 L.Ed. 565 (1956).
 
 
 55
 In conclusion, we reiterate that in this suit the District Court and this Court examine the case solely from a legal standpoint. They do not consider the evidence before the Secretary otherwise than to be assured his findings have support. The criterion is whether the Order is "in accordance with law". Here we cannot say it does not square with that standard.
 
 
 56
 The judgment of the District Court invalidating Federal Milk Marketing Order No. 127 (now No. 16) will be reversed and the causes now in review — in Appeals Nos. 8774, 8775, 8776, 8777, 8778, 8779 and 8849 — will be remanded to the District Court for the enforcement of the said Order in each of them, all cross appeals being denied.
 
 
 57
 Reversed and remanded.
 
 
 
 Notes:
 
 
 *
 The issue of the validity of the Order is here in seven appeals. In Nos. 8774, 8775, 8776 and 8777, the United States obtained decrees under § 608a(6) of the Act enforcing the Order against Mills Dairy, Willow Farms Dairy, City Dairy and Shiloh Dairy. Subsequently in a joint suit, No. 8778, Mills, City and Shiloh, and in a separate suit, No. 8779, Willow Farms, by way of a review of the Order under § 608c(15) (B) obtained the decree invalidating it. Thereupon the Court suspended the enforcement decrees. In these six cases the United States appeals to set aside the invalidation decree. In addition, there is an appeal by the United States, No. 8849, involving a joint decree of enforcement against Royal Farm Dairy, Wilton Farm Dairy and Aristocrat Dairy, which the Court later set aside but required compliance with the Milk Order for several months. The United States there too seeks to set aside the vacation of the Order; the dairies appeal against the compliance decreed for these months
 The opinion will consider the validity of the Milk Order as the common question in all of these appeals. Inasmuch as this determination will be decisive of all the appeals, no separate consideration need be given each decree.