**DAIRYLEA COOPERATIVE, INC.,
Plaintiff-Appellant,**

v.

**Earl L. BUTZ, Secretary of the Department of Agriculture of the United States, Defendant-Appellee,**

**Pennmarva Dairymen's Cooperative Federation, Inc., Intervenor-Appellee.**

**No. 1185, Docket 74–1160.**

United States Court of Appeals,
Second Circuit.

Argued June 17, 1974.

Decided Oct. 1, 1974.

Sydney C. Winton, New York City (Botein, Hays, Sklar & Herzberg, New York City, on the brief), Stanley M. Kolber and Mark J. Florsheim, New York City, of counsel), for appellant.

V. Pamela Davis, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., Gerald A. Rosenberg Asst. U. S., Atty., of counsel), for appellee.

Donald F. Copeland, Philadelphia, Pa. (Speese Kephart & Bongiovanni, Philadelphia, Pa., on the brief, Simpson

Thacher & Bartlett, New York City, of counsel), for intervenor-appellee.

Before SMITH and MANSFIELD, Circuit Judges, and BARTELS,* District Judge.

BARTELS, District Judge:

Dairylea Cooperative, Inc. ("Dairylea") is an association of dairy farmers organized pursuant to 7 U.S.C. § 291 (1970) which, in addition to representing producers, acts as a milk handler.[1] Its members are producers located in New York, New Jersey, Pennsylvania and elsewhere and subject generally to Federal Milk Marketing Order 2 (7 C. F.R. §§ 1002.1 et seq. (1974)). Pennmarva Dairymen's Cooperative Federation, Inc. ("Pennmarva"), which was permitted to intervene as a defendant in support of the challenged provisions of Federal Milk Marketing Order 4, is a federation of three cooperatives, allegedly representing forty-five hundred dairy farmers subject to Order 4.

In May, June and October of 1972 Dairylea was required, in order to meet the increased demands of one of its customers in Flemington, New Jersey, to shift milk produced by its members in other areas previously regulated and priced under Order 2, to the Flemington, New Jersey handler, and the milk thus became regulated and priced under Order 4. As hereafter explained, there are important differences between Order 2 and Order 4, though both were adopted by the Secretary of Agriculture ("Secretary") to effectuate the purposes of the Agricultural Marketing Agreement Act of 1937 ("the Act")[2] focusing primarily upon the seasonal adjustment of milk production in accordance with the market's needs. Dairylea claims that in shifting the milk of some of its member-producers from the Order 2 to the Order 4 area, they were penalized in a discriminatory manner by the imposition of an arbitrary low base for Class I sales for a period of from five to ten months resulting in a loss in excess of $262,500.

Accordingly, Dairylea challenges the Order 4 base-excess plan generally upon the grounds that it (a) violates the Act because it provides for substantially reduced returns to newly entering producers for a minimum period of five months and a maximum period of sixteen months, and (b) is not a reasoned decision supported by substantial evidence in the record. The Secretary not only asserts that the challenged section is fully authorized by the Act and supported by substantial evidence, but contends further that the District Court erred in accepting jurisdiction over the subject matter without requiring Dairylea to exhaust its administrative remedy. Before reaching the merits, it is necessary to turn to the threshold question of jurisdiction.

### Jurisdiction

We reluctantly conclude that Dairylea is a producer and as such was not required to exhaust any administrative remedy before invoking the jurisdiction of the District Court and indeed had no administrative remedy to exhaust. Considering the complicated nature of the provisions of the Act and the labyrinthian regulations issued thereunder, it would be most appropriate for Dairylea's complaint to be considered first by the Secretary, who possesses the facilities and the expertise to review and interpret the Act and regulations herein involved.[3] While a remand is most in-

---

* Of the Eastern District of New York, sitting by designation.

1. While the term "producer" is not defined in the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 et seq., it is defined at 7 C.F.R. § 1004.11 (1974). The term "handler" is defined generally in the statute at 7 U.S.C. § 608c(1) and more specifically in the regulations at 7 C.F.R. § 1004.9 (1974).

2. 7 U.S.C. §§ 601–624 (1970), as amended (Supp. III, 1973).

3. "The milk problem is so vast that fully to comprehend it would require an almost universal knowledge ranging from geology, biology, chemistry and medicine to the niceties

viting and would permit a dismissal of the complaint without reaching the merits, we regretfully find no authority which would justify such action.

Though the Act affects producers, it was not designed to regulate producers but to regulate handlers only.[4] Thus, while handlers may apply for judicial review of agricultural orders only after exhausting their administrative remedies, the Act is silent as to both judicial and administrative remedies for producers. 7 U.S.C. § 608c(15) (1970). The Supreme Court, however, has held that this silence does not bar producers from judicial remedies. Stark v. Wickard, 321 U.S. 288, 308–311, 64 S.Ct. 559, 88 L.Ed. 733 (1944); see Zuber v. Allen, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969).

■ The Government argues that Dairylea not only is a producer but also a handler and therefore must exhaust its administrative remedies under 7 U.S.C. § 608c(15) (1970) before instituting this action. It is true that Dairylea has acted as a handler to the extent of payments made by it to the Order 4 Producer-Settlement Fund, but it is not acting as such in this case. In fact, the Secretary has treated cooperatives as either handlers or producers on the basis of the interests they represent in the action then pending. See In re Producers Creamery Co. of Springfield, 23 A.D.

515 (1964).[5] In his testimony before Judge Carter, the Federal Milk Market Administrator for Order 4, Alexander St. Clair, admitted that a cooperative which is both a producer and a handler routinely may be treated as a producer.[6] The concern of Dairylea in this action is not the money which it paid into the Producer-Settlement Fund, since its total payments will remain constant whatever the outcome of the case, but with the money collected on behalf of its producer-members as authorized by 7 U.S.C. § 610(b)(1) (1970) which will increase if the action succeeds. See Inter-State Milk Producers' Cooperative, Inc. v. St. Clair, 314 F.Supp. 108, 111 (D.Md. 1970). Thus, for purposes of this suit, Dairylea must be deemed a producer suing in its representative capacity and accordingly the jurisdiction asserted below was proper.[7]

■ This is true even though the Secretary by letter from an Agricultural Department attorney abruptly offered to provide Dairylea with an administrative hearing two and one-half months after this action was commenced. In light of the regulations which restrict such remedies to handlers, 7 C.F.R. § 900.52 (1974), and the administrative decisions which have done the same, In re Producers Creamery Co. of Springfield, *supra*, such a letter does not satisfy the publi-

---

of the legislative, judicial and administrative processes of government. It affects an industry immense in scope, for dairying is said to be the largest single branch of agriculture in this country with the exception of that of raising livestock for slaughter, the annual money value of dairy products running to billions of dollars." Queensboro Farms Products v. Wickard, 137 F.2d 969, 975 (2d Cir. 1943).

4. " . . . No order issued under this chapter shall be applicable to any producer in his capacity as a producer." 7 U.S.C. § 608c(13)(B)(1970). See 7 U.S.C. § 608c(1) (1970).

5. See also 7 C.F.R. §§ 1004.9, 1004.12(b) (1974) which suggest that a cooperative may function as both a producer and a handler.

6. Such a policy also seems to accord with Congressional intent since the Act itself rec-

ognizes that an individual or entity may fit into more than one category. Thus, by 7 U.S.C. § 608c(13)(B) (1970) producers are exempted from regulation only in their capacities as producers. When a producer acts as a handler he is not so exempted. See also 7 U.S.C. § 608c(5)(C) (1970).

7. In Rasmussen v. Hardin, 461 F.2d 595 (9th Cir. 1972), which the Government cites, the petitioner was a producer-handler in Order 31, an entity different from either a producer or a handler, and the action was dismissed for failure to exhaust the administrative remedies which the court deemed open to producers-handlers. Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944), was held to apply only to producers, and in Order 31, as in Order 4, a producer-handler is deemed a handler. 7 C.F.R. §§ 1131.10, 1004.10 (1974).

cation requirements of the Administrative Procedure Act, 5 U.S.C. § 552(a)(1) (1970).[8] Upon this review it is our function to determine whether the Secretary's order is within his granted power, issued pursuant to proper procedure, and adequately supported by substantial evidence and reason. Davis, Administrative Law, § 5.03, p. 299 (1958 ed.); Fairmont Foods Co. v. Hardin, 143 U.S.App.D.C. 40, 442 F.2d 762, 767 (1971); Lewes Dairy, Inc. v. Freeman, 401 F.2d 308, 317 (3d Cir. 1968), cert. denied 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969).

### Milk Regulation under the Act

The rationale and scheme of milk regulation under the Act have been succinctly and fully described by the Supreme Court in Zuber v. Allen, *supra*, and Lehigh Valley Coop. Farmers, Inc. v. United States, 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962), and by many other authorities.[9] In order to properly focus upon the issue presented by the challenge to the validity of Order 4, it is necessary, however, to repeat some of this background.

Milk consumption is, more or less, uniform throughout the year, while milk production, on the other hand, is not uniform. Production varies, depending upon the season of the year. Since fluid milk is perishable, it must be produced and marketed steadily throughout the year in order to meet consumer demands. Milk has two end uses, one as a consumer diet and the other as manufactured dairy products, such as butter and cheese. There is a premium price for consumer milk, referred to in the Order as Class I milk, while the excess quantity of milk above such Class I use of milk, described in the Order as Class II milk, carries with it a lower price. This produces a two-price structure for the same quality product depending upon its use. Related to the price structure of milk is the seasonal fluctuation of its production. In the spring months, referred to as the flush period, when the bovine population is highly fertile, there is an overproduction of milk; whereas in the fall and winter months, referred to as the short period, the production of milk is considerably lower. Therefore, to meet the relatively uniform consumption of fluid milk throughout the year, larger herds must be maintained than are required for milk consumption during the flush months. Before the Act, handlers took advantage of the milk surplus thus arising during the flush months by obtaining bargain prices for milk through competition among producers. The purpose of the Act was to eliminate this destructive competition by providing a uniform price throughout the year for producers regardless of the use to which their milk is put by the handler. (7 U.S.C. § 608c(5)(B) (Supp. III, 1973)).[10]

The Act also provides for the promulgation by the Secretary of regulations called "marketing orders" which govern marketing of milk in various geographical areas of the United States ( 7 U.S.C. § 608c(1) (1970)); each of his 74 Marketing Orders covers a particular milk

---

8. The Government cites as a requirement for the exhaustion of administrative remedies In re Lehigh Valley, AMA Docket # M2–31 (Jan. 29, 1971), a non-final and unreported decision by a hearing examiner in the Department of Agriculture. There a cooperative was permitted to challenge administratively a seasonal adjustment plan. Such decision does not satisfy the publication requirements of the Administrative Procedure Act and, in fact, the jurisdictional issue was never discussed.

9. See Zuber v. Allen, *supra*, 396 U.S. at 172 fn. 2, 90 S.Ct. 314.

10. "The fluid milk industry is affected by factors of instability peculiar to itself which call for special methods of control. Under the best practicable adjustment of supply to demand the industry must carry a surplus of about 20 per cent., because milk, an essential food, must be available as demanded by consumers every day in the year, and demand and supply vary from day to day and according to the season; but milk is perishable and cannot be stored. Close adjustment of supply to demand is hindered by several factors difficult to control." Nebbia v. New York, 291 U.S. 502, 517, 54 S.Ct. 505, 507, 78 L.Ed. 940 (1933).

marketing area. The Secretary, through his regulations, has provided for a basic two-price structure which provides a higher value for fluid or Class I milk, and a lower value for the excess milk which is used in manufactured dairy products, Class II milk. To effectuate this structure and stabilize the market, regulations have been adopted which provide for two unique devices: (i) a uniform "blended" price fixed by the Market Administrator to be paid by handlers to each producer in the marketing area regardless of whether the handler disposes of milk at the high Class I price for fluid use, or at the lower Class II price for manufactured dairy products, and (ii) an equalization pool, called a Producer Settlement Fund, administered by the agent of the Secretary to maintain the blended price. Handlers make payments to the pool in the amount of the excess of their use value[11] over the adjusted uniform blended price paid by them to their producers, and handlers make withdrawals from the pool in the amount that the use value of the milk they purchase is less than the adjusted blended price they pay to their producers. The Act specifies several limited exceptions to price uniformity such as seasonal or annual adjustments which may be and are set forth in marketing orders, i. e., Base-Excess Plan (7 U.S.C. § 608c(5)(B)(d)), Louisville Plan (7 U.S.C. § 608c(5)(B)(e)), and Class I Base Plan (7 U.S.C. § 608c(5)(B)(f)).[12]

*Mechanics of Seasonal and Annual Adjustment Plans*

Section 608c(5)(B)(d) of the Act provides that an adjustment may be made in the uniform price "to encourage seasonal adjustments in the production of milk through equitable apportionment of the total value of the milk purchased by any handler, or by all handlers, among producers on the basis of their marketings of milk during a representative period of time . . . " To encourage such seasonal adjustments, the Secretary promulgated the base-excess provisions of Order 4 (7 C.F.R. § 1004.90–95 (1974)) which are designed to stimulate producers to offset the usual seasonal fluctuations in milk production by adjusting their production to the market's needs. The purpose of these provisions is to encourage fulfillment of the market's demands in the short season when milk is in short supply by providing for a lower Class II price to be paid for the excess of the producer's milk above the amount he produced during the previous short season. The Order provides that the base-making period for Class I milk shall be from August through December. The average daily pounds of milk delivered by each producer to an Order 4 handler during this base period is calculated and assigned as Class I milk carrying the highest price, and the milk in excess of the base milk is assigned as Class II milk carrying a lower price. Thus, the more milk the producer can produce in the short season from August 1st to December 31st, the larger will be his base for which he will receive the higher Class I price. Under this Order a base would be established for each producer depending upon his deliveries in the preceding months of August through December provided that under no circumstances shall the base period be less than four months. Producers establish new bases each year effective for the twelve-month period from March 1st through February of the following year.

Not all Orders, however, utilize the base-excess adjustment found in Order 4. Order 2, for example, which regulates parts of New York and New Jersey, uses the so-called Louisville Plan to stimulate seasonal adjustments. Under this plan a fixed amount is deducted

---

11. The Administrator sets the Class I and Class II use values and such values are not the prices charged the consumer by the handler, which are generally higher and unregulated. 7 U.S.C. § 608c(13)(A) (1970).

12. For others see 7 U.S.C. § 608c(5)(B)(a)–(c).

from prices otherwise payable to producers whose milk is delivered to the market during the flush months of overproduction and the amount so deducted is deposited in a fund which is used to add to the prices paid producers during the fall and winter months of undersupply. All producers delivering milk to the market during the fall and winter months receive the added increments irrespective of whether they have previously delivered to the market in the spring and summer months. 7 C.F.R. § 1002.71 (1974).

Some orders utilize no seasonal adjustment plan at all but rather an annual use adjustment plan called a Class I Base Plan. Dairylea claims, in fact, that the Order 4 plan is actually a Class I Base Plan (7 C.F.R. §§ 1125.90 et seq. (1974)). The Class I Base Plan is distinctly different from either the Base-Excess or the Louisville Plan. The Class I Base Plan is designed to control overproduction of milk and centers on the annual level of milk deliveries by each producer over one to three years, while Base-Excess and Louisville Plans are directed to control seasonality of production of a producer within one year.[13] Under a Class I Base Plan bases generally are assigned to eligible producers on the effective date of the plan based upon the four months of lowest production of the producer. The plan provides for a three-year rolling average to determine the production history of each producer for use in assigning him a Class I base, and his three-year production history would be the average of his deliveries during his four months of lowest production in each of the three years.[14]

The problem which has brought Dairylea before us is that under the Order 4 Base-Excess Plan possible prejudice arises when a producer from outside the Order begins to sell milk within the Order. Because of the necessity to build up a marketing base in the short season before he can obtain a Class I price, the new producer will not have a base until he has participated during the base-period months of August through December. For such new producers Order 4 provides an interim base for Class I milk as follows: January-February—60%; March-June—50%; July—60%; August-November—70%; December—60%. This interim base continues until the new producer is able to establish under Order 4 a base from August through December. 7 C.F.R. § 1004.92(e)(1974).

Special consideration is given to Order 2 producers (New York, New Jersey), like Dairylea, who enter the Order 4 region no later than October 1st. Such producers are permitted to calculate their base on the total amount of milk delivered in both order regions throughout August-December provided that the new Order 4 producer was an Order 2 producer on August 1st of that year and continued such status in all or part of the two months of August and September "and who otherwise was an Order No. 4 producer . . . for all of the remaining August through December period." 7 C.F.R. § 1004.92 (c) (1974). The result of this special consideration is to set a minimum three-month base-making period under Order 4 for certain Order 2 producers moving into Order 4 after August 1st but before October 1st, rather than the five-month period under Order 4 applicable to producers from other regions.

The new producer, of course, is compelled to utilize the above interim base percentages until March 1st of the year subsequent to the year in which he established an Order 4 base. Thus, an Order 2 producer who enters the Order 4 region November 1st must rely on the interim base not just until March 1st of the subsequent year but until March 1st of the second subsequent year, a period of sixteen months (maximum). Even

---

13. Base Plans in U.S. Milk Markets: Development, Status and Potential, June 1972, Marketing Research Report No. 957, U.S.

Department of Agriculture's Economic Research Services, at page 5.

14. See 37 F.R. 26019 et seq. (Dec. 7, 1972).

the least amount of time for which the new producer from Order 2 region would be compelled to rely on the interim base would be five months (October-March).[15] Dairylea made deliveries under Order 4 in May, June and October, 1972, and did not receive an historical base under Order 4 until March 1, 1973. In the meantime it received the interim percentage base averaging 60%, whereas it claims that predicated on its Order 2 production its historical base was 90%. It is these gaps during which interim percentages are applicable which are the subject of Dairylea's complaint.

### Propriety of Order 4

Dairylea does not contest the necessity for some sort of a plan to deal with seasonal production differentials. The basis of its challenge to Order 4 is the change from the former Order 4 base-excess plan, applicable only during the spring months, to a base-excess plan operating during the entire year coupled with allegedly arbitrarily assigned bases for new producers during the interim before acquiring an historical base. Dairylea alleges that this new Order 4 violates a number of specific provisions of the Act including (a) the requirement that producers receive uniform prices for their product, (b) the prohibition against trade barriers limiting the marketing of milk in any area, and (c) the prohibition against treating producers newly entering the market on a basis different from that accorded established producers except for a period not to exceed three months. The alleged violations will be discussed *seriatim*.

### (a) *The Uniform Price Requirement*

■■ Though the very foundation of the Act is to provide uniform prices to all producers in the marketing area subject only to specifically enumerated adjustments (7 U.S.C. § 608c(5)(B)), the Act does not reach the retail sale of milk. Dairylea cites Zuber v. Allen, *supra,* and Brannan v. Stark, 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497 (1952), as authorities in support of its claim that the price uniformity requirement has been violated by Order 4. Neither of these cases is in point. *Zuber, supra,* dealt only with a non-cost related geographical differential, while *Brannan* dealt with a compensatory differential charged to producers who were not cooperative members. Neither differential, the Court found, was authorized by the Act. Here, however, the base-excess plan is specifically enumerated as a permissible adjustment, 7 U.S.C. § 608c (5)(B)(d), as is the Louisville Plan in subsection (e) and the Class I Base Plan in subsection (f). In fact, the Court noted in *Zuber* that "[t]he foundation of the statutory scheme is to provide uniform prices to all producers in the marketing area, *subject only to specifically enumerated adjustments.*" 396 U.S. at 179, 90 S.Ct. at 321 (emphasis added). As the base-excess provision complained of is one of these specifically enumerated adjustments, it is a permitted exception to the rule of uniformity and does not constitute a violation of the Act. Vaughn-Griffin Packing Co. v. Freeman, 296 F.Supp. 458 (M.D.Fla. 1968), affirmed, 423 F.2d 1094 (5th Cir. 1970), is also cited by appellant for the proposition that the provisions of Order 4 are unconstitutionally discriminatory in violation of the uniform price requirement and the due process mandate of equal protection of the law. Since it involves entirely different facts relative to a different product, and likewise refers to dissimilar provisions of the Act, that case is inapposite.

### (b) *Trade Barrier Limitation of § 608c (5)(G)*

■ Dairylea, citing Lehigh Valley Cooperative Farmers, Inc. v. United States, *supra,* alleges that the base-ex-

---

15. Under the prior Order 4 base-excess plan, which Dairylea apparently approved, the base-making period was July through December but the base and excess prices were applicable only during the months of March through June, 7 C.F.R. §§ 1004.63, 1004.64 (1970). Under the new Order 4, of course, base and excess prices apply throughout the year.

cess plan of Order 4 violates 7 U.S.C. § 608c(5)(G) (1970) which specifically states that no marketing agreement or order "shall prohibit or in any manner limit . . . the marketing in that area of any milk or product thereof produced in any production area in the United States." Order 4 does not prohibit or limit the marketing of milk but simply provides a ceiling for a temporary period on the amount of milk for which a newly entering producer may receive a Class I price. It is not a trade barrier and does not interfere substantially with free acces to the market. This subsection was exhaustively reviewed in *Lehigh Valley Coop., supra,* by the Supreme Court. There the Secretary had included in Order 2 a provision for permanent compensatory payments on non-pool milk sold in the marketing area by outside order handlers. A handler who brought outside milk into the area and sold it for fluid use would have to pay the pool producers through the Producer Settlement Fund an amount equal to the difference between the minimum prices for the highest and lowest use classification prevaling in the area. This provision had the consequence of requiring non-pool milk to subsidize pool milk which was thus insulated from competition. Therefore, the Order set up an economic trade barrier specifically prohibited by 7 U.S.C. § 608c(5)(G). This decision does not bar all adjustments as illegal trade barriers. See Sunny Hill Farms Dairy Co., Inc. v. Hardin, 446 F.2d 1124, 1131 (8th Cir. 1971), cert. denied, 405 U.S. 917, 92 S. Ct. 940, 30 L.Ed.2d 786 (1972); Fairmont Foods Co. v. Hardin, *supra,* 143 U.S.App.D.C. 40, 442 F.2d at 771-772. In fact, Congress has authorized certain limitations on milk distribution in 7 U. S.C. §§ 608c(5)(B) and 608c(5)(D) (1970), (Supp. III, 1973). Moreover,

not only does the base-excess plan with which we are dealing provide for no compensatory payments, but unlike the *Lehigh Valley* plan it is specifically permitted by statute, 7 U.S.C. § 608c(5)(B)(d). Thus, as a temporary non-compensatory plan specifically permitted by law and requiring no substantial dislocation of new producers, the base-excess plan of Order 4 does not violate the trade barrier strictures of either the Act or the Supreme Court decisions.

(c) *Lowest Use Classification Limitation of § 608c(5)(D) and Three-Month Limitation of § 608c(5)(B) (f).*

Section 608c(5)(D) of the Act states that the marketing order shall provide that payments for milk purchased from producers entering the area shall be made for a period of approximately three months "at the price for the lowest use classification specified in such order, subject to the adjustments specified in paragraph (B) of this subsection." Dairylea asserts that because new producers may receive less than their historical bases for a period of from five to sixteen months, Order 4 violates the time limitation of this section of the Act. This is a *non-sequitur.* Section 608c(5)(D) specifically authorizes as an exception to this provision adjustments under § 608c(5)(B) which in turn authorizes base-excess plans such as found in Order 4 (§ 608c(5)(B)(d)). In addition, Order 4 does not provide a base for new producers consisting of "the lowest use classification specified in such order" for any period of time.[16]

■■ Clause (v) of § 608c(5)(B)(f) requires that newly entering producers receive an historical base within 90 days. It will be recalled that § 608c(5)(B)(d) referring to seasonal ad-

---

16. It is interesting to note that Dairylea has failed to show that an historical base predicated upon the lowest use classification mentioned in subsection (D) of the Act or based upon the past four months of the lowest production of the producer under a Class I

Base Plan, like the Puget Sound plan, would improve its position. It does not follow that such plans would provide a new producer during the entry period with larger returns than now provided by the base-excess plan of Order 4.

justments authorizes a base for a "representative period of time" which need not be limited to one year. The base-excess plan of Order 4 was adopted pursuant to § 608c(5)(B)(d) and not pursuant to § 608c(5)(B)(f). Dairylea claims that the 90-day limitation on non-historical bases under (f) is nevertheless applicable to Order 4. To support this contention, Dairylea quotes from the Congressional floor debates on the Agriculture Act of 1970. We cannot derive from these quotations any Congressional intent to incorporate § 608c (5)(B)(f)(v) into § 608c(5)(B)(d). Section 608c(5)(B)(d) definitely includes no such three-month limitation and we do not believe that Congress intended such limitation to be read in *sub silentio*. Even though the Act may be interpreted differently by one or two members of Congress,[17] this is not a sufficient indicia of Congressional intent. For the same reasons clause (iii) of § 608c(5)(B)(f), which we believe not to be applicable in any event, cannot be read into the base-excess adjustment, § 608c(5)(B)(d).

■■■ In a final attempt to bring the Order 4 plan under § 608c(5)(B)(f)(v), Dairylea maintains that Order 4 is in fact a Class I plan and not a base-excess plan and therefore is subject to the three-month limitation. The predicate for this claim is the fact that the Order 4 plan is effective for a twelve-month period. This fact, however, does not remove it from the category of base-excess plans which, as we have previously stated, are seasonal plans as contrasted with the Class I plan which is an annual use plan covering a representative period of from one to three years. There is no inherent reason why a twelve-month period cannot be employed to adjust seasonal fluctuations.[18] We are convinced from the record that Order 4 is a base-excess plan and are supported in this conclusion by a report of the Agriculture Committee of the House of Representatives (No. 93–337) filed on June 27, 1973, more than twelve months after the Order 4 base-excess plan became effective, which states that Class I base plans were adopted "[i]n only two orders, those for the Puget Sound, Washington, and Atlanta, Georgia, marketing areas."[19] Again we find no merit in Dairylea's argument.

### Reasonableness of the Order 4 Base-Excess Plan

Base-excess plans, such as the Order 4 plan, are clearly authorized by the Act. Included as an integral part of this Order, howver, are provisions designed to eliminate disruptive shifting of milk from outside farmers into the marketing

---

17. See statements of Representative Zwach (116 Cong.Rec. 27144, August 4, 1970) and Senator Nelson (116 Cong.Rec. 31808, Sept. 15, 1970).

18. "Although the underlying philosophy and objectives differ, base-excess seasonal pricing plans involve some of the same principles and logic as Class I base plans. Under base-excess seasonal plans, bases are established each year and entry to the market is relatively open. The base-forming period is during the short-production months; the base-paying period is generally in the flush months. Blend pricing occurs in months other than during the base-paying period.3 Under these plans, the producer who provides a certain quantity of milk in the fall months

"3 Four Federal order markets—Southern Michigan, Georgia, Washington-Oregon, and Middle Atlantic—had seasonal base-excess plans with 12-month base-paying periods as of January 1972."

when supplies are short establishes a claim or 'market right' to the fluid, higher priced (Class I) portion of the market during months when a surplus exists. (Fluid milk used for Class 1 purposes is higher priced than that used in manufacturing.)

"In contract, Class I base plans (relatively closed or semiclosed) involved 'market rights' of producers for a longer period of time. Concern centers more on the *annual* level of milk deliveries than on seasonality of production within the year. These plans operate on the principle that a producer who supplies a market during some designated period of time—say a specific year or period of years—establishes a claim or 'market right' to the higher price fluid market during subsequent years." U.S. Dept. of Agriculture Report # 957, Base Plans in U.S. Milk Markets, 4, 5 (1972).

19. 1973 U.S.Code Cong. and Admin.News at p. 1762.

area. These provisions are the main target of appellant's attack. Dairylea contends that the twelve-month base-excess plan is not only unnecessary to prevent disruptive inter-order shiftings between Order 2 and Order 4, but also is fatally defective because not designed to adjust seasonal fluctuations. On the contrary, it argues that the abuses of shiftings could have been obviated by the adoption of the Louisville Plan in Order 4 so that it would be consistent with Order 2 in controlling the delivery of outside milk during the flush period. It adds that there is no evidence to support the reasonableness of Order 4.

The two milk Orders 2 and 4 govern contiguous areas and were adopted to fit together in order to insure an adequate milk supply to both markets without disruption. Protection against shiftings was necessary in both Orders. Obviously, it would be desirable for an Order 4 producer to market milk under Order 2 in the fall during the Order 2 pay-out period since the added price would be paid to him whether or not he participated in the preceding spring months when sums were deducted. In doing so now, however, he would lose his Order 4 base period. Similarly, it would be desirable for an Order 2 producer to market milk under Order 4 in the spring months during the Order 2 pay-in period and thus escape deductions from prices otherwise payable to such a producer. To be successful now, however, he would have to satisfy the Order 4 requirement of a base built up under Order 4 in the fall.

The present limitations on the transfer of producers from Order 2 to Order 4 area were necessitated by prior abuses. As stated by the Secretary: "These numerous abuses of the base plan, which in many situtions were also abuses of the Louisville plan under either

Order 1 or 2, have resulted in considerable discontent on the part of many producers in the Delaware Valley market." 35 F.R. 7936. The Secretary has acknowledged that both the base-excess plan and the Louisville seasonal adjustment plan could be effective in promoting a desirable seasonality of production in the market (35 F.R. at 7936). The Order 4 plan was adopted only after hearings conducted under the auspices of the Secretary, at which both plans as well as the effects of shifting from one market to another were duly considered. Thereafter a vote was taken by the producers pursuant to 7 U.S.C. § 608c(19) (Supp. III, 1973), at which a substantial majority of the producers approved Order 4. The Secretary then reviewed the proposal and set forth the reasons underlying his decision to utilize the twelve-month base-excess plan. 35 F.R. 7924, 7936–38.[20] While the approval of the producers was not conclusive, the Secretary ws entitled to weigh the desires of the local producers in reaching his decision. It was entirely proper for him to choose the plan approved by the majority of Order 4 producers, provided the plan was statutorily authorized, reasonable and supported by adequate evidence. 7 U.S.C. §§ 608c(5)(B)(i), 608c(5)(I), 608c(8), 608c(9), 608c(19) (Supp. III, 1973). The record discloses that these requirements were satisfied. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456 (1951); United States v. Mills, 315 F.2d 828, 834 (4th Cir. 1963), cert. denied, 375 U.S. 819, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963).

To provide new producers with an historical base predicated upon their deliveries outside of the market, as suggested by Dairylea, would provide no incentive to increase Order 4 production during the short season. Under the current

---

**20.** "Both the base-excess plan and the Louisville seasonal incentive pricing plan obviously can be effective in promoting a desirable seasonality of production in any particular market. Although both plans have wide acceptance, the plan provided in any particular market should be one which has the approval of a substantial majority of producers in such market. The cooperatives representing such a majority of the producers in the markets here being merged support a base-excess plan." 35 F.R. 7924, 7936.

plan new producers have an incentive to enter the market during the short season. If given their Order 2 historical base as proposed by Dairylea, it would be just as advantageous for producers to enter the market during the flush season when extra milk is not needed. The twelve-month plan levels off milk production throughout the year by rewarding increased production during the short season and discouraging overproduction during the remainder of the year. The statute authorizes the Secretary to do just this. 7 U.S.C. § 602 (1970). At the same time the plan requires outside producers to rely upon interim percentages for a temporary period, which could be as short as five months, before they receive the same historical base as those who have already served the market during the period of its greatest need.

There can be little doubt that some obstacle should be imposed upon the sporadic shifting of outside producers into Order 4 when it is favorable and leaving it when it is unfavorable. The question raised is whether that obstacle is reasonable under the circumstances. In his finding the Secretry stated:

> "It is concluded that the latter percentages will provide reasonable treatment for new producers and that no further provision is needed for the purpose of providing interim bases. Bases computed on these percentages would not appear to be so high as to encourage new producers to come on the market at a time when their milk is not needed for Class I purposes. At the same time, they would not be so low as to discourage any producer who intends to become permanently associated with the market." 35 F.R. at 7937.

As we stated above, special consideration is given to Order 2 producers who enter the Order 4 market. George W. O'Brien, an economist for Dairylea, testified that on a percentage basis a denial of an historical base to the new producer

results in a 10% deduction in his income. But this, of course, is temporary for the months before the new producer acquires his base and varies depending upon the date of entry. Dairylea adds that these interim percentages amount to penalizing "outsiders" coming into the market for the benefit of "insiders." Dr. Paul E. Hand, an economist called by Pennmarva, testified that if the base-excess provisions of Order 4 were eliminated, the effect on the market would be "catastrophic." If the producers intend to be permanently associated with the market, the temporary burden is relatively slight and can be soon amortized in the future with the passage of time and at the same time it will offer a protection to them as permanent producers against temporary shiftings. If, on the other hand, such producers do not intend to remain associated with the market, the temporary percentages are necessary to protect the inside producers and to prevent disorderly market conditions. We believe the Secretary's percentage provisions for interim bases to new producers are adequately supported by the record and bear a rational relationship to the proper purposes of a base-excess plan and are reasonable.

The fact that Dairylea might have been better served by a Louisville plan is not sufficient reason to invalidate the plan now before us. Lewes Dairy, Inc. v. Freeman, *supra,* 401 F.2d at 319; see In re Lehigh Valley Cooperative Farmers, AMA Docket # M2–31 (Jan. 29, 1971) at 33. In so complicated an area as milk regulation, a perfect plan which would be equally agreeable to old and new, temporary and permanent producers inside and outside the marketing area is virtually impossible. Finally, it is relevant to note that there is nothing new about a twelve-month base-excess plan. In fact, such a plan similar to Order 4 with an average of approximately 60% interim bases for new entries has for over a decade ending in 1967 been successfully operated under the Puget

Sound marketing orders of the Secretary.[21]

For reasons above stated, we find no merit in Dairylea's claims and accordingly the Order of the District Court is affirmed.

21. U.S. Dept. of Agriculture Report #957, Base Plans in U.S. Milk Markets, 17, 21, and 7 C.F.R. § 1125.60 (1964).