COMMUNITY NUTRITION INSTITUTE,
et al., Appellants,

v.

John R. BLOCK, Secretary, United
States Department of
Agriculture, et al.

No. 81–2191.

United States Court of Appeals,
District of Columbia Circuit.

Argued 4 Oct. 1982.

Decided 21 Jan. 1983.

Janie A. Kinney, Washington, D.C., with whom Ronald L. Plesser and Steven H. Leyton, Washington, D.C., were on the brief, for appellants.

Susan Sleater, Atty., Dept. of Justice, Washington, D.C., with whom Stanley S. Harris, U.S. Atty. and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees, Block, et al.

Sydney Berde, St. Paul, Minn., of the Bar of the Supreme Court of Minnesota, pro hac vice by special leave of Court, with whom James R. Murphy and Charles W. Bills, Washington, D.C., Richard M. Hagstrom, Gary W. Schokmiller, St. Paul, Minn., were on the brief, for appellees, Nat. Milk Producers Federation, et al.

Before TAMM, WILKEY and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

Opinion concurring in part and dissenting in part filed by Circuit Judge SCALIA.

WILKEY, Circuit Judge:

Appellants, three individual consumers of milk, a non-profit consumer organization and a handler of milk products, have joined forces to challenge the manner in which reconstituted milk is regulated under forty-seven milk market orders adopted pursuant to the Agricultural Marketing Agreement Act (AMAA).[1] The district court dismissed their complaint, holding that the individual consumers and the organization lacked standing and that the handler failed to exhaust his administrative remedies. We reverse the district court's decision with respect to the individual consumers and remand the case for a decision on the merits.

## I. BACKGROUND

### A. The Regulatory Scheme

The Secretary of Agriculture (the Secretary) has regulated the milk industry through the use of milk market orders since 1937.[2] These orders, issued pursuant to section 608c of the AMAA,[3] regulate the price milk producers[4] receive for their dairy products. The orders are effective on a regional basis and cover most, but not all,

of the United States.[5] Under the orders, dairy products are divided into separate classes, based on the use to which the raw milk is ultimately put. Raw milk which is processed and bottled for fluid consumption is Class I milk.[6] Raw milk which is used to produce manufactured milk products such as butter, cheese, or dry milk powder is classified as Class II milk.[7]

Class I milk must be consumed rather quickly after it is produced because it is a fertile field for bacteria. It is therefore sold mostly on a regional basis. Class II milk products, on the other hand, can be stored for a longer period of time and therefore compete directly with similar products from across the nation. As a result of this increased competition, Class II milk commands a lower price on the market than fluid milk.

In order to provide dairy farmers with the stability needed to prevent a recurrence of the ruinous competition that devastated the milk industry during the depression,[8] section 608c authorizes the Secretary to issue milk market orders ensuring that producers receive uniform prices for their raw milk irrespective of the use to which it is put.[9] Thus, under current milk market orders "handlers"[10] (who buy the milk from the producers) pay a minimum price for Class I milk and a lower minimum price for Class II milk. The handlers make all payments into a regional pool, and producers are then paid out of the pool on the basis of

---

1. 7 U.S.C. §§ 601–624 (1976 & Supp. V 1981).

2. The conditions leading to the enactment of the AMAA have been chronicled in previous judicial decisions. *See, e.g., Zuber v. Allen,* 396 U.S. 168, 172–76, 90 S.Ct. 314, 317–19, 24 L.Ed.2d 345 (1969); *Shepps Dairy, Inc. v. Bergland,* 628 F.2d 11, 13–15 (D.C.Cir.1979).

3. 7 U.S.C. § 608c (1976 & Supp. V 1981).

4. A producer is "any person who produces milk in compliance with the inspection requirements of a duly constituted health authority, which milk is received at a pool plant or diverted . . . from a pool plant to a non-pool plant." 7 C.F.R. § 1012.12 (1982) (Tampa Bay Marketing Order).

5. 7 C.F.R. §§ 1001–1139 (1982).

6. *See, e.g., Id.,* § 1012.40(a).

7. *See, e.g., Id.,* § 1012.40(b). Under many orders milk is divided into three classes. However, for purposes of this case, all milk other than milk used for fluid purposes will be referred to as Class II milk.

8. *See* note 2 *supra.*

9. 7 U.S.C. § 608c(5)(B)(ii) (1976).

10. Handlers are "processors, associations of producers, and others engaged in the handling of any agricultural commodity or product." 7 U.S.C. § 608c(1) (1976).

the average price received for milk in all uses.[11]

Reconstituted milk products are fluid products manufactured by combining water with whole milk powder or nonfat powder.[12] Reconstituted milk was not regulated under the milk market orders for nearly thirty years, but in 1964 the Secretary issued the regulations which are the subject of this dispute.[13] Under these regulations, a handler who purchases milk powder from outside the order area and manufactures it into a reconstituted milk product pays the Class II price and reports the purchase to the order area administrator.[14] The reconstituted milk product is then regulated as though it were fresh milk coming into the area from an unregulated area (an area not subject to a milk market order).[15] It is assumed that the handler will use the reconstituted milk to manufacture Class II products,[16] but if the handler's records show that he has not manufactured enough Class II products to account for all the reconstituted milk, he is required to make a compensatory payment on the remainder.[17] The compensatory payment is equal to the difference between the Class I and Class II prices and is put into the regional pool for distribution, not to the seller of the milk powder, but to the local producers of fresh milk.[18] It is undisputed that the compensatory payment requirement raises the handler's cost of producing reconstituted fluid milk and it is this aspect of the various milk market orders which appellants challenge.

## B. *The Present Litigation*

On 23 August 1979 appellants petitioned the Secretary of Agriculture to eliminate the compensatory payment requirement from the various milk market orders. Nineteen months later, having failed to receive a response to their petition, appellants filed the present action in federal district court, claiming that the regulation requiring compensatory payments exceeded the Secretary's authority under the AMAA and violated the provision of the AMAA prohibiting economic trade barriers on milk and milk products, and that his refusal to act on their petition was arbitrary and capricious. Appellants asked the court to invalidate, and enjoin the enforcement of, the compensatory payment provisions of the various milk market orders.

On 7 April 1981, four months after this suit was filed, the Secretary denied appellant's petition. This decision was made after "a careful and thorough review of the issues," based on public comments and "a comprehensive preliminary economic impact statement" developed by the agency.[19]

On 29 September 1981 the district court granted appellees'[20] motion to dismiss appellants' complaint. The court first held that the individual consumers and the Community Nutrition Institute (CNI) lacked standing, concluding that they had not shown the requisite injury in fact, that their interests were not within the zone of interests arguably protected by the relevant

---

**11.** This average price is referred to as the "uniform price" or "blend price." The method for computing this price is set out in 7 C.F.R. § 1012.61 (1982).

**12.** Butterfat or nondairy fats such as coconut oil may also be added. The milk is then considered to be "filled" milk.

**13.** 28 Fed.Reg. 11,848 (1963); 28 Fed.Reg. 11,956, 12,000 (1963); 29 Fed.Reg. 9,002, 9,110, 9,214 (1964). In 1969 the regulations were expanded to cover "filled" milk. 34 Fed.Reg. 16,548 (1969).

**14.** 7 C.F.R. § 1012.30(a)(b) (1982).

**15.** *Id.,* § 1012.14(c).

**16.** *See, e.g., Id.,* § 1012.44(a)(5)(i).

**17.** *Id.,* § 1012.60(e).

**18.** *Id.,* § 1012.71(a)(1).

**19.** Letter from William T. Manley, Deputy Administrator, Marketing Program Operations, to Community Nutrition Institute, 7 April 1981 (USDA Decision Letter) at 1, *reprinted in* Joint Appendix (JA) at 170.

**20.** Appellees include the Secretary of Agriculture and the United States Department of Agriculture (the Secretary) and the National Milk Producers Federation, Associated Milk Producers, Inc., and Central Milk Producers Cooperative (Producers).

statute, and that, in any event, Congress intended to preclude consumers from challenging milk market orders in court. The court dismissed the milk handler as well, noting that although he had standing (since the AMAA specifically authorizes judicial review for handlers),[21] he could not be allowed to prosecute the present litigation because he had not complied with the procedural requirements outlined in the statute, thereby failing to exhaust his administrative remedies. This appeal followed.

## II. STANDING

### A. General Principles

In the last decade the Supreme Court has addressed the issue of standing in a variety of contexts.[22] This increased activity has not resulted in a complete clarification of the law;[23] nevertheless, some discernable guidelines have been laid down. It will be helpful to examine these guidelines before applying them to the specific facts of the case at hand.

■ It is clear that "[t]he term 'standing' subsumes a blend of constitutional requirements and prudential considera-

tions."[24] It is now also clear that there are at least three elements a plaintiff must establish in order to satisfy the constitutionally imposed standing requirements.

[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show [1] that he personally has suffered some actual and threatened injury as a result of the putatively illegal conduct of the defendant," . . . and [2] that the injury "fairly can be traced to the challenged action" and [3] "is likely to be redressed by a favorable decision."[25]

■ Establishing the first element (injury in fact) requires the plaintiff to allege facts demonstrating a definable and discernable injury and an adequate connection between that injury and himself. The requirements of the second and third elements, however, have not always been as clear. Some confusion has arisen because the Supreme Court has used language which seems to indicate that the "fairly traceable causation" requirement and the "redressability" requirement are interchangeable.[26] However, the Court's articu-

---

**21.** 7 U.S.C. § 608c(15) (1976).

**22.** *E.g., Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

**23.** *See, e.g.,* Sedler, *Standing and the Burger Court: An Analysis and Some Proposals for Legislative Reform,* 30 RUTGERS L.REV. 863 (1977); Davis, *Standing 1976,* 72 NW.L.REV. 69 (1977); Chayes, *The Role of the Judge in Public Law Litigation,* 89 HARV.L.REV. 1281, 1304–05 (1976).

**24.** *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. at 471, 102 S.Ct. at 758.

**25.** *Id.* at 472, 102 S.Ct. at 758 (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979) and *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976)). *See also Consumers Union v. Federal Trade Commission,* 691 F.2d 575, 577 n. 9 (D.C.Cir.1982) (en banc).

**26.** For example, in *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the Court stated: "The more difficult step in the standing inquiry is establishing that these injuries 'fairly can be traced to the challenged action of the defendant,' . . . *or put otherwise,* that the exercise of the Court's remedial powers would redress the claimed injuries." *Id.* at 74, 98 S.Ct. at 2631 (quoting *Eastern Kentucky,* 426 U.S. at 41, 96 S.Ct. at 1925) (emphasis added). Similarly, in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the Court observed that Art. III required a plaintiff to establish that "the asserted injury was the conse-

lation of the Art. III standing limits in *Valley Forge* recognizes that the two considerations are not necessarily the same.[27] The fairly traceable causation inquiry is directed toward the connection between the injury and the *defendant's actions.* The redressability inquiry, on the other hand, focuses on the connection between the injury and the *action requested of the court.* The fairly traceable causation requirement is therefore generally based on past or present occurrences (the effect of the defendant's actions), while the redressability requirement is based on future probabilities (the effect of the court's decision). Of course, there is a correlation between the two elements. As the connection between the alleged injury and the defendant's actions becomes more direct, the likelihood that requiring the defendant to change his behavior will redress that injury increases. However, it is important to keep the two inquiries separate, lest the confusion continue.[28]

Therefore, in order to satisfy the Art. III requirements of standing a plaintiff must show three things: (1) that he has suffered an actual or threatened injury (an adequate connection between a definable and discernable injury and the plaintiff); (2) that the injury fairly can be traced to the challenged action (an adequate connection between the alleged injury and the defendant's actions); and (3) that the injury is likely to be redressed by a favorable decision (an adequate connection between the alleged injury and the action requested of the court).

■ Once a plaintiff has met the constitutionally imposed requirements of standing he may still be prevented from prosecuting his suit if prudential considerations[29] dictate that the court stay its hand. Of particular concern to this litigation are the requirement that the plaintiff's complaint be "arguably within the zone of interests to be protected or regulated by the statute

quence of the defendant's actions [fairly traceable causation], *or* that prospective relief will remove the harm [redressability]." *Id.* at 505, 95 S.Ct. at 2208 (emphasis added).

27. The Court stated that Art. III requires a plaintiff to show that he has suffered a personal injury and that the injury " 'fairly can be traced to the challenged action, *and* 'is likely to be redressed by a favorable decision.' " *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Eastern Kentucky Welfare Rights,* 426 U.S. at 38, 41, 96 S.Ct. at 1924, 1925) (emphasis added).

28. A good example of the difference between the "fairly traceable causation" and the "redressability" requirements can be found in the facts involved in *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). In *Duke Power* plaintiffs challenged the Price-Anderson Act, which established a limit on the liability of nuclear power plant operators. The alleged injuries consisted of the adverse environmental and aesthetic consequences of the thermal pollution caused by Duke Power's nuclear power plants. Thus, in order to determine whether the injury could fairly be traced to the federal government, the Court was required to determine whether the existence of the Price-Anderson Act was a cause of the decision to *construct* the nuclear power plant (which was in turn the more immediate cause of the alleged injuries). However, assuming the power plant

was substantially completed or already operational, the court would have to determine whether invalidating the Act would cause the plant to *shut down* in order to determine redressability. This is an entirely different consideration because once a company has expended funds to construct a plant, the absence of a liability limitation may not be as important. *See* Nichol, *Causation as a Standing Requirement: The Unprincipled Use of Judicial Restraint,* 69 Ky.L.J. 185, 199–201 (1980).

29. In a prior opinion this court explained the meaning of the term prudential consideration.

We believe that the fact that the [non-constitutional] limitations of the standing doctrine ... are termed "prudential limitations" does not mean that the lower courts have discretion as to whether to apply these limitations or not. The Supreme Court has announced these prudential limitations in its supervisory capacity over the federal judiciary and, in the context of cases such as the one now before us, we believe *there is a nondiscretionary duty* to apply the limitations. This duty to apply the standards does not detract from the discretion involved in determining whether the standard has been satisfied.

*Tax Analysts & Advocates v. Blumenthal,* 566 F.2d 130, 137 n. 37 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) (emphasis added).

... in question," [30] and the reluctance of federal courts to adjudicate " 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." [31] These prudential considerations also focus on the connection between the alleged injury and various aspects of the suit. The zone of interests requirement focuses on the connection between the alleged injury and the relevant statute, while the generalized grievance limit seems [32] to require an inquiry into the connection between the alleged injury and the public in general.

Thus, in order to withstand the present motion to dismiss for lack of standing, appellants must allege a definable and discernible injury and then establish the proper connection between that injury and themselves, the Secretary's actions, the requested relief, the relevant statute, and the public in general. We hold that the individual consumers have met this burden, while CNI has not.

### B. *Individual Consumer Standing*

Deborah Harrell, Ralph Desmarais, and Zy Weinberg (Consumers) are, according to their allegations, consumers of fluid dairy products who seek to decrease their food expenditures without sacrificing taste or the nutritional value of their diet.[33] The district court dismissed them from the present litigation, holding that they had failed to establish either the constitutional or prudential elements of standing. Applying the analysis outlined above, we must reverse.

### 1. *Art. III Considerations*

### a. *Injury in fact* (connection between definable and discernable injury and the plaintiff)

In order to establish the required injury, a plaintiff need not allege facts establishing a substantial injury, "an identifiable trifle will suffice." [34] However, the injury must be definable and discernable and, in order to establish the proper connection to the plaintiff, it must be specific.[35] Consumers have alleged just such an injury.

Consumers allege that the existing reconstituted milk regulations injure them in two ways. First, they claim they are precluded from purchasing "a nutritious dairy beverage at a lower price than fresh drinking milk." [36] Second, they allege that they are deprived "of a stabilizing market influence," since "[a] reconstituted fluid product could quickly expand the fluid milk supply when [seasonal] changes result in a reduction of the whole fluid milk supply." [37] Appellees maintain that these injuries fail to meet the constitutional standard of concreteness. They argue that since milk powder is available to Consumers at retail markets, Consumers could buy the powder and

---

**30.** *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). *See also Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760; *Gladstone, Realtors,* 441 U.S. at 100 n. 6, 99 S.Ct. at 1608 n. 6; *Eastern Kentucky Welfare Rights,* 426 U.S. at 39 n. 19, 96 S.Ct. at 1924 n. 19.

**31.** *Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Warth v. Seldin,* 422 U.S. at 499–500, 95 S.Ct. at 2205–06). The Supreme Court has observed that another prudential consideration is embodied in the general rule that a " 'plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " *Id.* 454 U.S. at 474, 102 S.Ct. at 759–60 (quoting *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205). That consideration is not a concern in this litigation.

**32.** The exact nature of the generalized grievance restriction is far from clear. *See* note 74 *infra.*

**33.** Plaintiffs' Complaint for Declaratory Action and Injunctive Relief (Plaintiffs' Complaint) at ¶ 7, *reprinted in* JA at 20.

**34.** *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 714 (D.C.Cir.1977) (citing *United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973)).

**35.** *Id.* at 715.

**36.** Plaintiffs' Complaint at ¶ 28, *reprinted in* JA at 25–26.

**37.** *Id.* at ¶ 31, JA at 26.

reconstitute the milk themselves at less than the price of whole milk. Thus, appellees contend, the injury asserted by Consumers is merely an objection to the taste of reconstituted milk from products presently marketed at retail. This, they claim, is not a definable and discernable injury. However, even assuming appellees are correct in asserting that undesirable taste is an insufficient injury,[38] their argument is still unpersuasive.

In determining whether a plaintiff has alleged a definable and discernable injury, the focus is on the plaintiff's *allegations, not* on the availability of alternative remedies. Consumers allege that they are being deprived of a lower priced alternative to whole milk. If these allegations are true, as we must assume, Consumers have been injured economically, even if they could ameliorate this injury by purchasing some alternative product. Further, if as Consumers allege, the absence of manufacturer reconstituted milk results in seasonal shortages in the milk supply, they have sustained a further injury. At the trial Consumers may be unable to prove that they have actually sustained these injuries, but their allegations meet the constitutional requirement of injury in fact.[39]

b. *Causation* (connection between the alleged injury and the defendant's actions)

In order to establish the second constitutional element of standing, a plaintiff must show that the injury " 'fairly can be traced to the challenged action.' "[40] Al-

though this requirement has not been applied consistently in all cases,[41] it is met if the plaintiff alleges a *fairly* traceable connection between the defendant's action and the alleged injury. A plaintiff need only make a reasonable showing that "but for" defendant's action the alleged injury would not have occurred.[42] Consumers have sufficiently established this connection.

Consumers allege that when the compensatory payment is added to the other costs incurred by a handler in producing reconstituted milk, the resulting price makes reconstituted milk products uncompetitive with fresh milk.[43] They claim that "but for" the regulation, handlers would be able to market reconstituted milk for less than fresh milk and that, as a result, reconstituted milk would be available at a lower retail price than whole milk. Appellees dispute the factual basis of Consumers' allegations. According to appellees, the market structure of the dairy industry is so complex that it is impossible to determine whether lower handler costs would have been passed on to Consumers. Thus, appellees argue, it cannot be said with any certainty that the challenged regulation is the cause of Consumers' injury. Again, however, appellees' argument misses the mark.

It may well be that the structure of the dairy market is so complex that a reduction in handler costs does not inevitably result in lower consumer prices. Nonetheless, Consumers are not required to *prove* that lower prices will result, they are only required to *assert* a *fairly* traceable causal connection between the challenged action and the al-

---

**38.** Although we do not decide the issue, such an injury *may* be sufficient since " '[a]esthetic and environmental well-being, ... are important ingredients in the quality of life in our society.' " *Duke Power,* 438 U.S. at 74 n. 18, 98 S.Ct. at 2631 n. 18 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972)) (emphasis added).

**39.** There is no dispute over the adequacy of the connection between the alleged injury and Consumers. Nor could there be since Consumers allege that *they* have been deprived of a lower cost milk alternative and of the stabilizing influence that product would bring to the dairy market.

**40.** *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Eastern Kentucky Welfare Rights,* 426 U.S. at 41, 96 S.Ct. at 1925).

**41.** *See Nichol, supra* note 28 at 196; Note, *The Generalized Grievance Restriction: Prudential Restraint or Constitutional Mandate?,* 70 GEO. L.J. 1157, 1158 n. 7 (1982).

**42.** *Duke Power,* 438 U.S. at 74–75, 98 S.Ct. at 2630–31.

**43.** Plaintiffs' Complaint at ¶ 26, JA at 25.

leged injury. Consumers' contention that if handlers were not required to make a compensatory payment they would pass the savings on to the consumer is a reasonable one. Nothing more is required. If standing depended on a plaintiff's ability to allege uncontrovertible facts, there would be very few plaintiffs who could establish standing in a lawsuit of any complexity. Having alleged a reasonable connection between the challenged regulations and their alleged injuries, Consumers are entitled to a trial on the merits to determine what the facts really are.[44]

c. *Redressability* (connection between the alleged injury and the action requested of the court)

 The third element of the Art. III limit on standing is met when a plaintiff establishes that his alleged injury " 'is likely to be redressed by a favorable decision.' "[45] The degree of likelihood required is not completely clear.[46] However, because the relevant inquiry is directed to the effect of a future act (the court's grant of the requested relief) it would be unreasonable to require the plaintiff to *prove* that granting the requested relief is *certain* to alleviate his injury. Furthermore, as cases such as the present one show, litigation often "present[s] complex interrelationships between private and government activity that make difficult absolute proof that the harm will be removed."[47] Thus, a court should be careful not to require too much from a plaintiff attempting to show redressability, lest it abdicate its responsibility of granting

relief to those injured by illegal governmental action.

 Consumers argue that they have established the required likelihood of redress by producing a United States Department of Agriculture Impact Statement which predicts that if the compensatory payment requirement were eliminated, consumers nationwide would save $186 million annually within three years,[48] and by offering evidence that handlers in non-regulated areas have manufactured and marketed lower-priced reconstituted milk.[49] The district court found this showing inadequate because the same USDA statement relied upon by Consumers estimated that elimination of the compensatory payment requirement would cost milk *producers* $576 million. The court observed that this drop in producer earnings *"might* interfere with the public's access to an adequate supply of milk and *might* result in higher prices for milk products."[50] The court concluded that since the structure of the dairy industry is so complex, "any benefit to the plaintiffs from the proposed changes in the regulations is hypothetical and speculative."[51] We conclude that the district court required too much of Consumers.

Admittedly, it is hard to predict the effect of removing the compensatory payment requirement, but Consumers produced evidence indicating that the *immediate* result of removing the contested regulation will be increased savings for all consumers.

---

44. Had Consumers' allegations been insufficient to establish the requisite causal link, the defect would have been corrected by Consumers' proffered evidence that in those areas not covered by federal milk market orders reconstituted milk had been and was being manufactured and sold to consumers for less than the price of fresh milk, JA at 66, and by affidavits of milk handlers indicating that the regulations raised the price of reconstituted milk so as to make it uneconomical to produce. *CNI v. Block,* No. 80–3077, *slip op.* at 6 (D.D.C. 29 Sept.1981).

45. *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Eastern Kentucky Welfare Rights,* 426 U.S. at 38, 96 S.Ct. at 1924). *See also Gladstone, Realtors,* 441 U.S. at 100, 99 S.Ct. at

1608; *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 262, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977).

46. *See* Nichol, *supra* note 28, at 201–13.

47. *Id.* at 215.

48. 45 Fed.Reg. 75,956, 75,971 (1980), *reprinted in* JA at 77.

49. *Id.* at 75,960, JA at 66.

50. *CNI, slip op.* at 7 (emphasis added).

51. *Id.*

The possibility that the change would also harm producers is relevant to the standing issue only in that such a harm *might* cause market disruptions which *might ultimately* harm Consumers. Whether the potential long term deleterious effects of the requested change outweigh the potential immediate benefits is a question the court will have to resolve in order to determine the validity of the regulation. However, Consumers should not be required to prove that the potentially harmful effects will not occur in order to establish standing. As the Supreme Court has observed, a plaintiff is not required to negate every "speculative and hypothetical possibilit[y] . . . in order to demonstrate the likely effectiveness of judicial relief." [52] Requiring Consumers to show more than they did in this case forces them to prove their case in order to acquire standing. This is not what the Constitution requires. The redressability element of Art. III is designed to bar disputes which will not be resolved by judicial action. It does not prevent a court from hearing a case which may ultimately be unsuccessful.

### 2. *Prudential Considerations*

As noted above,[53] there are valid nonconstitutional requirements which a plaintiff may be required to meet in order to establish standing. The district court found that one of these, the zone of interests requirement, had not been met by Consumers. On appeal, appellees point to another nonconstitutional standing requirement which they claim Consumers have not satisfied—the requirement that the alleged injury be more than a generalized grievance. We hold that Consumers have satisfied both of these requirements.

a. *Zone of Interests* (connection between the alleged injury and the relevant statute)

The Supreme Court has stated that a plaintiff may be dismissed for lack of standing if his alleged injury is not "arguably within the zone of interests protected or regulated by the statute . . . in question." [54] Whether Consumers' alleged injuries are arguably within the zone of interests protected by the relevant statute in this case depends on which statutes are relevant.

Consumers point to two portions of the AMAA policy section which indicate an intent to protect consumers from the type of injuries they have allegedly incurred. Section 602(2) expresses Congress' intent to protect consumers against unwarrantably rapid or excessive price increases by limiting the Secretary's authority to fix prices at parity and no higher.[55] Section 602(4) expresses the policy of protecting consumers from "unreasonable fluctuations in supplies and prices." [56] The district court, relying on this court's opinion in *Tax Analysts and*

---

**52.** *Duke Power*, 438 U.S. at 78, 98 S.Ct. at 2633.

**53.** *See* text at notes 29–32 *supra.*

**54.** *Association of Data Processing Service*, 396 U.S. at 153, 90 S.Ct. at 829.

**55.** In full section 602(2) provides:
It is declared to be the policy of Congress—
(2) To protect the interest of the consumer by (a) approaching the level of prices which it is declared to be the policy of Congress to establish in subsection (1) of this section by gradual correction of the current level at as rapid a rate as the Secretary of Agriculture deems to be in the public interest and feasible in view of the current consumptive demand in domestic and foreign markets, and (b) authorizing no action under this chapter which has for its purpose the maintenance of prices to farmers above the level which it is declared to be the policy of Congress to establish in subsection (1) of this section.
7 U.S.C. § 602(2) (1976).

**56.** 7 U.S.C. § 602(4) (1976). The entire section provides:
It is declared to be the policy of Congress—
(4) Through the exercise of the powers conferred upon the Secretary of Agriculture under this chapter, to establish and maintain such orderly marketing conditions for any agricultural commodity enumerated in section 608c(2) of this title as will provide, in the interests of producers and consumers, an orderly flow of the supply thereof to market throughout its normal marketing season to avoid unreasonable fluctuations in supplies and prices.

*Advocates v. Blumenthal*,[57] held that these sections were not relevant to the present suit, pointing out that the challenged regulations were issued pursuant to section 608c which does not mention consumers.

In *Tax Analysts* we held that the general policy section of a statute may be read in conjunction with the challenged portion only if the two parts of the statute share "an identity of purpose."[58] The district court ruled that section 608c and sections 602(2) and (4) do not share this identity of purpose. The court noted that section 608c was enacted as part of the original AMAA in the 1930's and that it dealt solely with milk market orders.[59] Section 602(4), on the other hand, was added to the AMAA in 1954. Relying extensively on legislative history,[60] the court concluded that the 1954 amendment was designed to counter the falling farm prices caused by the surplus of commodities after the Korean War and that the expressed intent to protect consumers was limited to situations involving price supports and parity pricing. Thus, in the district court's view, section 602(4) was not a "relevant statute" since it was enacted at a different time, in response to a different problem than section 608c. The court also found section 602(2) irrelevant since it dealt with parity pricing and not milk market orders. However, the district court's approach in analyzing the identity of purpose issue, although undeniably thorough in its

own right, was not consistent with the reasoning we utilized in *Tax Analysts*. As a result, the district court failed to reach the correct result.

In *Tax Analysts* we stressed the "generous nature" of the zone of interests test.[61] In particular we noted that a plaintiff was only required to assert an interest "which is *arguable from the face of the statute*."[62] Consumers have clearly done this much. Although section 608c deals exclusively with the Secretary's authority to issue market orders, it is not immunized from the effect of the general policy sections. Section 608c(4) requires the Secretary to find that an order "will tend to effectuate the declared policy of this chapter" before he issues that order.[63] The declared policies of the AMAA are contained in section 602. Section 602(4) clearly expresses the policy that the Secretary use "the powers conferred ... under this chapter ... as will provide in the interests of producers *and consumers,* an orderly supply [of milk] ... *to avoid unreasonable fluctuations in supplies and prices.*"[64] Since Consumers allege that the challenged portion of the milk market orders prohibits the sale of reconstituted milk, resulting in higher milk prices and seasonal shortages, they have asserted an interest which is at least "arguably" within the zone of protected interests.[65] The district court's efforts to distinguish the two sections by examining the legislative histo-

---

**57.** 566 F.2d 130 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

**58.** *Id.* at 141.

**59.** Section 608c gives the Secretary authority to issue market orders for a variety of agricultural commodities, but milk is the only one with which this litigation is concerned.

**60.** H.R.Rep. No. 1927, 83rd Cong., 2d Sess., *reprinted in* 1954 U.S.Code Cong. & Ad.News 3399.

**61.** 566 F.2d at 142.

**62.** *Id.* (emphasis added).

**63.** 7 U.S.C. § 608c(4) (1976).

**64.** 7 U.S.C. § 602(4) (1976) (emphasis added). The dissent argues that the references to consumer interests are mere "pious platitudes"

which have "no real bearing" on the issue of standing. Dissent at 1258. The references to consumers may be pious, but Congress expressly directed the Secretary to take those "platitudes" into account when issuing a milk market order, 7 U.S.C. § 608c(4) (1976), and to terminate any order that does not effectuate them. *Id.* § 608c(16)(A).

**65.** In almost any regulatory scheme some interests will be more directly affected than others. However, contrary to the dissent's argument, this does not require us to dismiss those whose interests may be less directly affected. As this court has observed, "the challenging party need only show that it is an intended beneficiary of the statute not necessarily the primary one." *Constructores Civiles de Centroamerica, S.A. v. Hannah,* 459 F.2d 1183, 1189 (D.C.Cir. 1972).

ry in great detail is simply inconsistent with the purposes behind the zone of interests test.[66]

### b. *Generalized Grievance*

The Supreme Court has noted that even when a plaintiff meets the Art. III standing requirements, a federal court may refrain from adjudicating issues which "amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches."[67] Appellees argue that Consumers' injury falls into this category since it is an injury suffered in "some indefinite way in common with people generally."[68] However, a review of the cases relied on by appellees[69] and an examination of the argument they advance[70] make it apparent that they confuse this prudential consideration with the constitutional requirement of injury in fact.[71] As we have already noted,[72] Consumers' alleged injury is sufficiently definable and discernable to meet the constitutional re-

quirement and appellees' efforts to litigate this issue under a new title must be rejected.

■ Consumers' injury is a generalized grievance only in the sense that it is shared by many other persons, *i.e.,* every other cost-conscious consumer of milk. It may be argued that the widespread nature of the injury requires us to dismiss the claim as a generalized grievance. However, we refuse to believe that the mere fact that a plaintiff's injury is shared by many people requires a court to dismiss his complaint. If dismissal were required in such cases, consumer injuries would never be justiciable because "[c]onsumer injuries, by their very nature tend to be shared in common by many other similarly situated individuals."[73] Although it is not clear what the limits of the generalized grievance restriction are,[74] we hold that the mere fact that the injury may be shared by many consumers does not require us to dismiss this complaint on that ground.

**66.** As we noted in *Tax Analysts:*

[A] full-scale examination of legislative history presents the distinct possibility that the generous nature of the zone test, which results from the language of the test itself, will be undermined. Such an approach may lead to a requirement that there be affirmative evidence that the Congress intended that a plaintiff situated precisely as the plaintiff then standing before the court be regulated or protected. Any tendency to move in this direction would detract from the flexibility of the zone standard provided by the requirement that the plaintiffs' interest be only "arguably" within the zone.

566 F.2d at 142.

**67.** *Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Warth v. Seldin,* 422 U.S. at 499–500, 95 S.Ct. at 2205–06).

**68.** *Frothingham v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923).

**69.** *E.g., O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974) ("Abstract injury is not enough"); *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 715 (D.C.Cir.1978) (the injury "must be perceptible, concrete, specific . . . .").

**70.** It is in this section of his brief that the Secretary makes the argument that Consumers' injury amounts to no more than an "objection to the taste of reconstituted milk from powder presently marketed at retail . . . ."

Fed. Appellees Brief at 25. *Cf.* text at note 38, *supra.*

**71.** Appellees' confusion is understandable given the Supreme Court's failure consistently to articulate whether the generalized grievance restriction is a prudential or a constitutional limit. *See* Note, *The Generalized Grievance Restriction: Prudential Restraint or Constitutional Mandate,* 70 Geo.L.J. 1157 (1982). Indeed, the Supreme Court contributed to this confusion in *Valley Forge* by clearly labeling the generalized grievance as a prudential consideration in one part of the opinion, 454 U.S. at 474–75, 102 S.Ct. at 759–60, and then later noting that the " 'case or controversy' aspect of standing is unsatisfied 'where a taxpayer seeks to employ a federal court as a forum in which to air his *generalized grievances* about the conduct of government or the allocation of power in the Federal System.' " *Id.* at 479, 102 S.Ct. at 762 (quoting *Flast v. Cohen,* 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L.Ed.2d 947 (1968)) (emphasis added).

**72.** *See* text at notes 34–39 *supra.*

**73.** *Cutler v. Kennedy,* 475 F.Supp. 838, 848 n. 23 (D.D.C.1979).

**74.** It is not clear whether the restriction has ever been applied as a nonconstitutional limit. Supreme Court cases relying on the generalized grievance restriction as a ground for denying

▇▇▇ Finding that neither constitutional nor prudential considerations prevent Consumers from bringing the present action, we reverse the district court and hold that Consumers have standing.[75]

## C. *CNI's Organizational Standing*

Community Nutrition Institute (CNI) is a non-profit charitable organization specializing in food and nutrition issues. CNI seeks to establish standing as an organization in its own right. The district court held that CNI failed to meet the standing requirements and accordingly, dismissed the organization. Because we conclude that CNI has not met the constitutional requirements of standing, we affirm the district court on this issue.

### 1. *Injury in fact*

CNI alleges that it has suffered two injuries as a result of the allegedly illegal com-

---

standing seem to have been decided on *constitutional* grounds. *See, e.g., Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974) ("Such a generalized interest ... is too abstract to constitute a 'case or controversy' ...."); *United States v. Richardson,* 418 U.S. 166, 179–80, 94 S.Ct. 2940, 2947–48, 41 L.Ed.2d 678 (1974) ("to invoke judicial power the claimant must have a 'personal stake in the outcome,' ... or a 'particular, concrete injury' ... or 'a direct injury,' ..., in short, something more than a generalized grievance.") (citations omitted). The cases in which the generalized grievance restriction has been clearly labeled as a prudential consideration have not used it as a ground for decision. *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205; *Gladstone, Realtors,* 441 U.S. at 100, 99 S.Ct. at 1608. Therefore, the scope of the restriction as a nonconstitutional limit is not clear.

It is also unclear whether the restriction serves an independent purpose. In *Warth* the Court noted that prudential limitations like the generalized grievance restriction were required because otherwise "the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." 422 U.S. at 500, 95 S.Ct. at 2206. *See also Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760. If a question is abstract, the *constitutional* limits on standing require dismissal. If on the other hand, the concern is that other governmental institutions are more competent to address the question, the political question doctrine, a prudential consideration, would appear to require dismissal. *See Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

**75.** We also reject appellees' argument that Congress has impliedly precluded consumers from challenging milk market orders. Appellees rely on *Rasmussen v. Hardin,* 461 F.2d 595 (9th Cir.), *cert. denied,* 409 U.S. 933, 93 S.Ct. 230, 34 L.Ed.2d 188 (1972), in which the 9th Circuit held that Congress had precluded judi-

cial review of consumer challenges to milk market orders. In *Rasmussen* the court noted that while the AMAA provides a special review procedure for handlers affected by a milk market order, it does not provide a similar procedure for consumers. The court found that this omission was deliberate because: (1) "the whole structure of the Act contemplates a cooperative venture between the Secretary, the producers, and the handlers," *id.* at 599; (2) to grant standing to consumers would defeat Congress' intent that all challenges be initially considered by the agency rather than the courts, *id.* at 599–600; and (3) granting standing to consumers would encourage handlers to bypass the agency by finding a consumer who would lend his name to a suit challenging the order. *Id.* at 600.

We conclude that this does not constitute the type of clear and convincing evidence of congressional intent needed to overcome the presumption in favor of judicial review, *see, e.g., Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1977), especially since no legislative history or statutory language is cited. *See National Association of Home Health Agencies v. Schweiker,* 690 F.2d 932, 942 (D.C.Cir.1982). The mere fact that review is expressly provided for handlers is not conclusive. *See Stark v. Wickard,* 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944) (producers can challenge the administration of a milk market fund, even though there was an express judicial review provision for handlers but not for producers). Moreover, if Congress intended to channel all challenges through the agency, producers should also be required to follow that route. Yet, several courts have concluded that challenges by producers may be heard by courts without first being considered by the Secretary. *Dairylea Cooperative, Inc. v. Butz,* 504 F.2d 80, 83 (2d Cir.1974); *Jones v. Bergland,* 456 F.Supp. 635, 641–42 (E.D.Pa. 1978). Finally, the Ninth Circuit's concern over handler-consumer collusion is an inadequate basis for inferring *congressional* intent. In the absence of some evidence that Congress at least considered the issue, we refuse to hold that Congress intended to leave consumers without a remedy.

pensatory payment requirement: (1) the requirement obstructs CNI's institutional interest in "seeing that consumers" have nutritious fluid dairy products available at the lowest possible price;[76] and (2) it prevents CNI from fully achieving its educational objective of informing low-income individuals about sources of low-cost nutritional food.[77] Only the later allegation satisfies the injury in fact requirement.

An obstruction of an organization's interest in "seeing" that consumers have nutritious fluid products available at the lowest possible price is not the type of definable and discernible injury that permits an organization to establish standing. In *Simon v. Eastern Kentucky Welfare Rights Organization*[78] the Supreme Court held that an organization interested in seeing that poor people had access to health services, "could not establish ... standing on the basis of that goal."[79] The Court, citing *Sierra Club v. Morton*,[80] noted that "an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III."[81] In *Sierra Club* the Court held that an injury to the Sierra Club's institutional interest in seeing that the nation's natural resources were protected from man's degradation was not a sufficient basis for establishing standing.[82] CNI's interest in "seeing" that consumers have the nutrition they need at the lowest possible price is the same type of abstract interest which the Supreme Court held was insufficient in *Eastern Kentucky Welfare Rights* and *Sierra Club.*

CNI cites *CNI v. Bergland*[83] as support for its contention that its alleged injury is sufficient to establish standing. In *Bergland* the court held that CNI had standing as a *representative* of consumers to challenge regulations implementing the National School Lunch and Breakfast program. The court noted that CNI had standing because it was an organization "*speaking for individuals,* whose health and nutrition interests are affected by the Secretary's action."[84] In the present case CNI seeks to establish standing on the basis of its *institutional* interests. It is not acting as a spokesman for individual consumers.[85]

CNI further seeks to shore up its argument by citing *Havens Realty Corp. v. Coleman.*[86] In *Havens Realty* the Supreme Court held that a plaintiff organization had institutional standing because it alleged that defendant's racial steering practices frustrated "its efforts to assist equal access to housing through counseling and other referral services."[87] CNI argues that their alleged injury is identical to that alleged by the organization in *Havens Realty.* However, the Court in *Havens Realty* noted that the defendant's actions interfered with the "organization's *activities,*" distinguishing those activities from the "organization's abstract social interests."[88] In the present case CNI claims it has an interest in "seeing" that consumers receive dairy products at the lowest possible price. It does not allege that it assists them in doing this, nor does it allege that the contested regulation impedes it from assisting consumers. It

**76.** Appellants' Brief at 23. *See also* Plaintiffs' Complaint at ¶ 5, JA at 21.

**77.** *Id.*

**78.** 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1978).

**79.** *Id.* at 39–40, 96 S.Ct. at 1924–25.

**80.** 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

**81.** 426 U.S. at 40, 96 S.Ct. at 1925 (citations omitted).

**82.** 405 U.S. at 739–741, 92 S.Ct. at 1368–69.

**83.** 493 F.Supp. 488 (D.D.C.1980).

**84.** *Id.* at 492 (emphasis added).

**85.** CNI has not alleged that its members have been injured as a result of the challenged action. *Cf. Warth,* 422 U.S. at 511, 95 S.Ct. at 2211.

**86.** 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

**87.** *Id.* at 379, 102 S.Ct. at 1124.

**88.** *Id.* (emphasis added).

seeks standing on the basis of its abstract interest in seeing that consumers achieve this goal. Such an injury is not sufficiently concrete to establish standing.

■ CNI's second *alleged* injury does meet the injury in fact requirement. If, as CNI alleges, it has been prevented from informing low-income individuals about sources of low-cost food, it has suffered a definable and discernible injury because it would be prevented from carrying out one of its primary activities.[89] However, this alleged injury cannot be the basis for establishing standing in this case because CNI has failed to establish *any connection* between the alleged injury and the challenged regulation.

### 2. Causation

CNI alleges that the challenged regulation interferes with its efforts to inform low-income individuals about the sources of low cost food. However, CNI fails to assert *any* reasonable connection between that injury and the Secretary's actions. Nothing in the challenged regulation affect CNI's ability to inform consumers about sources of low cost food. Thus, this case is distinguishable from *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission,*[90] on which CNI relies. In *Scientists' Institute* this court held that an association's educational activities were impaired by the AEC's refusal to prepare an impact statement. In the present case the Secretary has made a study of the effect of removing the contested portion of the milk market orders and has made that information available to the public. The contested

regulation has no impact on the availability of information which CNI seeks to disseminate. It may limit the availability of low-priced dairy products, but that is not the injury of which CNI complains. CNI has failed to establish any connection between the Secretary's actions and an injury to its educational activities. Having failed to satisfy the constitutional requirements of standing, CNI is precluded from litigating the issues on the merits.

### III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Appellant Joseph Oberweis is a handler of milk products. It is undisputed that he has standing to bring the present suit.[91] Nevertheless, the district court dismissed Oberweis, holding that he failed to exhaust his administrative remedies. Oberweis admits that he has not meticulously followed the statutory procedures for filing a "handler petition" under section 608c(15)(A),[92] but he argues that he should not be required to file another petition because he has substantially complied with the requirements of that section. We must reject that argument, however, because of the context in which the present action arose.

The present action is *not* an appeal from the Secretary's decision denying the petition filed by Oberweis and the other appellants in 1979. The complaint in this action was filed 2 December 1980, four months *before* the Secretary acted on the 1979 petition. In the complaint appellants asked the court, *inter alia,* to hold that the Secretary's *refusal to act* on the petition was arbitrary

---

**89.** *See Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission,* 481 F.2d 1079, 1086 n. 28 (D.C.Cir.1973).

**90.** 481 F.2d 1079 (D.C.Cir.1973).

**91.** *See* 7 U.S.C. § 608c(15)(A) (1976).

**92.** *Id.*
In full the section provides:
 Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modi-

fication thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition, in accordance with regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law.
 Section 608c(15)(B) vests federal district courts with jurisdiction to review the Secretary's ruling on a section 15(A) petition. *Id.,* § 608c(15)(B).

and capricious,[93] but they did not seek review of the decision itself. Appellants challenge the Secretary's authority to *adopt* the compensatory payment regulation *in the first place;* their complaint did *not* attack his subsequent refusal to correct that alleged wrong. Thus, Oberweis' argument that he substantially complied with section 15(A) by joining the other appellants in filing a petition in 1979 is misguided since he is not seeking a review of the Secretary's decision with respect to that petition. If Oberweis wants a court to decide whether his 1979 petition substantially complies with the exhaustion requirements of section 15(A) he will have to challenge the Secretary's decision on *that* petition. We express no opinion on the validity of Oberweis' argument in that respect because the present case does not involve that petition.

 Since Oberweis is not appealing from a ruling in which he first petitioned the Secretary for relief, we hold that he has not exhausted his administrative remedies as required by the statute.[94]

## IV. CONCLUSION

 The individual consumers in this case established a definable and discernible injury and the proper connection between that injury and the various aspects of the

suit. The district court's insistence that they prove more than they did was improper. A plaintiff is not required to prove his case in order to acquire standing. The district court did, however, correctly conclude that CNI failed to satisfy the constitutional elements of standing. An organization cannot establish standing on the basis of its abstract interest in seeing that justice prevails. The district court was also correct in its decision to dismiss Oberweis.[95] Accordingly, the district court's opinion is affirmed in part and reversed in part, and the case is remanded to the district court for a decision on the merits.

*It is so ordered.*

SCALIA, Circuit Judge, concurring in part and dissenting in part:

I join Part II C of the Court's opinion, which affirms dismissal of Community Nutrition Institute for lack of standing. I concur in the result of Part III, affirming the dismissal of Oberweis, but would rest dismissal upon the ground assigned by the district court: the failure to exhaust administrative remedies. I dissent from the Court's action in reversing the district court's dismissal of the individual consumers, who in my view were correctly found to lack standing.

---

**93.** Since the Secretary ultimately acted on the petition, appellants' complaint concerning his refusal to act is now moot.

**94.** Unlike Oberweis, Consumers are not required to follow the procedures outlined in section 15(A) because they are not covered by that section, which deals with handlers only. Nor is there any basis for inferring that Consumers should be subject to the same requirements. Section 15(A) was designed to prevent a handler (who is the only party subject to liability for violating a milk market order) from needlessly interrupting enforcement proceedings initiated by the Secretary against the handler. *See United States v. Ruzicka,* 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290 (1946). The exhaustion requirement of section 15(A) thus establishes "an equitable and expeditious procedure for testing the validity of orders, *without hampering the Government's power to enforce compliance* with their terms." H.Rep. No. 1241, 74 Cong., 1st Sess. 14 (1935) (emphasis added). Since a suit by a group of consumers will not directly interfere with any pending enforcement proceedings, there is no reason to stretch

section 15(A) beyond its express limits. *Cf. Dairylea Cooperative, Inc. v. Butz,* 504 F.2d 80, 83 (2d Cir.1974) (producer allowed to challenge milk market order without first petitioning the Secretary for relief); *Jones v. Bergland,* 456 F.Supp. 635, 641–42 (E.D.Pa.1978) (producer not required to exhaust administrative remedies because he had no remedies to exhaust).

**95.** Because this action is not an appeal from a ruling under 7 U.S.C. § 608c(15)(A), the district court's jurisdiction will exist under 28 U.S.C. § 1331, rather than 7 U.S.C. § 608c(15)(B). Nevertheless, the district court's scope of review is still somewhat limited. The compensatory payment regulation should be sustained if it is within the Secretary's granted power, issued pursuant to proper procedure, and supported by adequate evidence and reason *when adopted. Dairylea Cooperative, Inc. v. Butz,* 504 F.2d 80, 84 (2d Cir.1974). *See generally* K. DAVIS, ADMINISTRATIVE LAW TREATISE § 5.03, at 299 (1958).

1256

## THE INDIVIDUAL CONSUMERS

This suit challenging federal agency action invokes the "generous review provisions"[1] of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706 (1976), which have "greatly expanded the availability of judicial review,"[2] conferring standing where preexisting "prudential limitations" would exclude it.[3] The zone of interest test was originally formulated to describe the application of these statutory provisions.[4] Although it has subsequently been used in non-APA cases, to describe one of the prudential limitations upon standing in general,[5] its application in that context is not likely the same. The Supreme Court's most recent recitation of the "arguably within the zone of interests" formula in a non-APA case omits the word "arguably."[6]

In a suit such as this, however, seeking review of action by a federal agency, the original formulation in all its liberality applies. When interpreting its meaning, one must bear in mind that the test represents not an independent judicial prescription, but a judicial attempt to ascertain legislative intent. It is supposed to indicate when Congress intended to make a particular litigant "a proper party to request an adjudication of a particular issue."[7] In the context of suits challenging agency action it is meant to determine whether Congress in-

tended the plaintiff to serve as a "private attorney general,"[8] "to bring to the attention of the appellate court errors of law" by the Executive branch.[9]

The test becomes a progressively weaker indication of such intent as the breadth of the zone of interests within which the plaintiff claims his interests lies is increased. Thus, in *Data Processing, supra* note 4, it was eminently reasonable to conclude that Congress intended a proscription against the Comptroller General's allowance of competition to be enforceable in the courts by one of the injured competitors. It would be less reasonable, however, to conclude that a legislative directive to the Comptroller General to audit all banking institutions displays a congressional intent to permit suit by all bank depositors. The reason for the difference is the same as the reason underlying the "generalized grievance" thread of judicially imposed limitations upon standing[10]: Governmental mischief whose effects are widely distributed is more readily remedied through the political process, and does not call into play the distinctive function of the courts as guardians against oppression of the few by the many. Thus, for such matters it is less likely that Congress intended the creation of private attorneys general to supplement, through the courts, the President's primary responsi-

1. *Shaughnessy v. Pedreiro,* 349 U.S. 48, 51, 75 S.Ct. 591, 594, 99 L.Ed. 868 (1955).

2. *Heikkila v. Barber,* 345 U.S. 229, 232, 73 S.Ct. 603, 604, 97 L.Ed. 972 (1953).

3. See *Sierra Club v. Morton,* 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972).

4. See *id.* (citing *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970)).

5. See, e.g., *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100 n. 6, 99 S.Ct. 1601, 1608 n. 6, 60 L.Ed.2d 66 (1979); *Boston Stock Exchange v. State Tax Comm'n,* 429 U.S. 318, 320–21 n. 3, 97 S.Ct. 599, 602–03 n. 3, 50 L.Ed.2d 514 (1977).

6. *Valley Forge Christian College v. Americans United for Separation of Church and State,*

Inc., 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982).

7. *Sierra Club v. Morton, supra* note 3, 405 U.S. at 732 n. 3, 92 S.Ct. at 1364 n. 3 (quoting *Flast v. Cohen,* 392 U.S. 83, 100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968)).

8. *Association of Data Processing Service Organizations v. Camp, supra* note 4, 396 U.S. at 154, 90 S.Ct. at 830.

9. *FCC v. Sanders Brothers Radio Station,* 309 U.S. 470, 477, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940).

10. See, e.g., *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 217–20, 94 S.Ct. 2925, 2930–31, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 176–80, 94 S.Ct. 2940, 2946–48, 41 L.Ed.2d 678 (1974); *Ex parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937).

bility to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3.

Even so, where the statute in question seeks to protect nothing but generalized interests, a "hospitable" interpretation of the APA may justify placing that entire class within its expanded prescription of standing. That was the case, for example, with the National Environmental Policy Act, which was directed not to the protection of any narrow group or class, but to the preservation of the environment for the benefit of the entire country. The Supreme Court found that anyone who used the natural resources assertedly affected by disregard of the Act had standing to sue.[11] It is quite another matter, however, when a statutory provision benefits generalized interests *through the protection of more particularized interests to which it is immediately directed.* Almost any statute has generalized indirect benefits; ultimate improvement of the society at large is the whole theoretical justification for heeding the requests of "special interests." But where there is a direct and immediate beneficiary class which can be relied upon to challenge agency disregard of the law, the claim of the indirect general beneficiaries to be congressionally designated "private attorneys general" is weak indeed. In such circumstances the whole premise of the liberalized standing provisions no longer applies:

> The right of judicial review is ordinarily inferred where congressional intent to protect the interests of the class of which the plaintiff is a member can be found; in such cases, unless members of the protected class may have judicial review the statutory objectives might not be realized.[12]

The consumer plaintiffs in the present case are indirect general beneficiaries. The direct beneficiaries of milk marketing orders under the Agricultural Marketing Agreement Act (AMAA) are milk produc-

ers. Even before adoption of the APA, the courts found a congressional intent to permit them to sue.[13] On the other side of the ledger, the direct beneficiaries of any limitations upon the Secretary's authority with regard to milk marketing orders are the milk handlers who pay the artificially established prices. Congress expressly gave them standing to obtain judicial review in the AMAA itself. 7 U.S.C. § 608c(15)(B) (1976). In such a situation, where the narrow class immediately affected by both agency excess and agency omission is readily identifiable, I do not believe that a more remote beneficiary class as generalized as the one here (*viz.,* all consumers of fluid milk products—which cannot exclude many of the nation's households) can be found to meet the zone of interests test.

Consumer interests with regard to milk marketing orders can be consequential to *either* milk handlers' interests (as in the present case) *or* producers' interests. The latter would be the situation if not high prices (or, what ultimately amounts to the same, the unavailability of a ready substitute to augment fluid milk supplies at the retail level) but rather inadequacy of production were the gravamen of the complaint. In my view, consumers would have standing in neither situation, but their case is particularly weak in the former, where the primary vindicator of the generalized interest in question is specifically designated by judicial review provisions of the statute itself. It is true enough, as *Stark v. Wickard, supra* note 13, amply demonstrates,[14] that explicit provision for review by one class of interests does not necessarily imply an absence of intent to provide review to other interests whose grievance is quite distinct. But where, as in the present case, the second grievance is entirely derivative of the first—where consumers complain that they will have to pay more *be-*

**11.** *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

**12.** *Barlow v. Collins, supra* note 4, 397 U.S. at 167, 90 S.Ct. at 838.

**13.** *Stark v. Wickard,* 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944).

**14.** *See* the dissent of Frankfurter, J., 321 U.S. at 317, 64 S.Ct. at 574.

*cause* milk handlers will have to pay more—then the statutory review provision does suggest that the more remote group was not meant to have standing to sue.

My conclusion is unaffected by the allusions to consumer interests in the general purpose section of the act, 7 U.S.C. § 602(2), (4) (1976). With regard to an interest so generalized, they seem to me to represent, if not (as the Ninth Circuit said in a case contradicting the majority's holding here) "pious platitudes," [15] then at least no more than a recital of the ultimate purpose of the statutory scheme which has no real bearing upon who was expected to enforce it.

### APPELLANT OBERWEIS

I concur in affirming the district court's dismissal of the milk handler's suit. I would base the affirmance, however, upon the ground used by the district court: failure to exhaust administrative remedies.

Before us and the district court, Oberweis makes the same claim as the other appellants, that the milk marketing order was invalid. He does not seek to appeal denial of the 1979 petition for rulemaking, in which he joined the other appellants in alleging, among other things, invalidity of the order; but he asserts that the filing and denial of that petition satisfied the requirement that he exhaust his § 608c(15)(A) remedies—a requirement that does not apply to the other appellants. If I understand the majority opinion correctly, its dismissal of Oberweis's complaint is based upon the proposition that when a requirement of exhaustion of administrative remedies exists, appeal must be taken from the agency denial that constitutes the exhaustion, and the grievance cannot be brought to court in any other fashion. That may be correct, but I have some doubt, since it seems a most rigid application of a doctrine that is generally

quite flexible—so that, for example, exhaustion is excused entirely when it would obviously be unavailing.[16] I prefer, therefore, to rest my disposition of this aspect of the case upon what seems to me surer ground: that Oberweis's petition could not in any event comply with the exhaustion requirement.

As the majority opinion notes, Oberweis is forced to admit that he "has not meticulously followed the statutory procedures for filing a 'handler petition'." (Maj. Op. at 1254.) That admission is an understatement. The real problem is not how Oberweis framed his demand, but what he demanded and was provided. He was entitled to ask for and receive a formal adjudicatory hearing that would produce a ruling on the legality of the challenged order. That proceeding would be conducted before an administrative law judge, and the relative merits of Oberweis's assertions and the Secretary's position would be tested and reviewed on the basis of record evidence.[17] What Oberweis sought, however, was a hearing of quite a different sort inquiring into quite a different question—an informal rulemaking proceeding to decide whether the order should be revised. There the decisionmaker would not be limited to record evidence, assertions would not be tested by cross-examination, and (evidently of some importance to those with whom Oberweis made common cause) persons other than producers and handlers would be permitted full participation. In fact, to be entirely accurate Oberweis sought even less than this—namely, merely consideration of *whether* such a rulemaking proceeding would be desirable. The situation is thus quite different from that in cases such as *Joseph v. FCC,* 404 F.2d 207 (D.C.Cir.1968), in which a belated request for public hearing was held to be the equivalent of a motion for reconsideration. There the nature of the consideration which the agency would be compelled to give the two re-

---

**15.** *Rasmussen v. Hardin,* 461 F.2d 595, 599 (9th Cir.), *cert. denied,* 409 U.S. 933, 93 S.Ct. 230, 34 L.Ed.2d 188 (1972).

**16.** *See American Federation of Government Employees v. Acree,* 475 F.2d 1289 (D.C.Cir.

1973); *Wolff v. Selective Service Local Board,* 372 F.2d 817 (2d Cir.1967).

**17.** 7 U.S.C. § 608c(15)(A) (1976); 7 C.F.R. § 900.50–900.71 (1982). *See* 5 U.S.C. §§ 554, 556–557 (1976 & Supp. IV 1980).

quests was substantially identical; here it is not.

The Secretary gave Oberweis no more than the type of consideration and the scope of determination he requested—which was less than he was required to seek before applying to this court. One can hardly blame the Secretary for not treating the request as (what it clearly was not) a demand for a § 608c(15)(A) proceeding. The first sentence of the petition stated that it was filed "pursuant to" 5 U.S.C. § 553, the general rulemaking provision of the APA and 7 C.F.R. § 1.28, the provision of the agency regulations addressing the filing of petitions for rulemaking. Moreover, the petition was joined by the consumer plaintiffs who had no standing to participate in a § 608c(15)(A) proceeding. Oberweis was not misled regarding the agency's treatment of the petition, since his attorney was advised that, insofar as claims of illegality were concerned, "§ 608c(15)(A) and (B), provides the means through which any handler ... may seek legal recourse."[18]

It might be asserted, I suppose, that the agency was too generous in entertaining Oberweis's petition; and that if it did not insist upon the exclusiveness of his § 608c(15)(A) remedy in the administrative proceedings it cannot now do so before the courts. In fact, however, the agency is not asserting that his § 608c(15)(A) remedy is *exclusive*—only that it must be pursued before an attack upon the marketing order itself may be taken to the courts. Nothing prohibits a handler from petitioning for a rulemaking if he wishes, but that petition may, within what has hitherto been considered the broadest discretion, be denied. What the doctrine of exhaustion requires is that in order to challenge the substance of the marketing order the handler must resort—before or after the denial of this dis-

cretionary relief—to the much more categorical claim he has upon the agency's attention, namely his right to obtain a full-dress adjudicatory hearing resulting in a ruling on the validity of the order. No such hearing has been requested or held,[19] and no such ruling has issued.[20]

The situation might be different if the denial of the petition for rulemaking were clear indication that the adjudicatory hearing could be of no avail. It is not. Different procedures are prescribed not for their own sake, but for the different effects which they are likely to have upon the outcome. Even if the Secretary's action in denying Oberweis's petition at the conclusion of the informal proceeding could properly be regarded as a determination that the marketing order is valid, it is not certain that the same determination would have been made in the formal proceeding which Oberweis should have demanded.

For the above reasons, I would affirm in all respects the decision of the district court.

---

**18.** Letter from Sec. Bergland to Ronald L. Plesser (Aug. 11, 1980), *reprinted in* Jt.App. at 60.

**19.** Indeed, not even an informal public hearing was held, though that was requested and considered. *See* Letter from Ronald L. Plesser (appellants' attorney) to Sec. Bergland (July 1, 1980), *reprinted in* Jt.App. at 57; Letter from William T. Manley, Dep. Administrator, Marketing Program Operations, to Ellen Haas and Thomas B. Smith (CNI) (Apr. 7, 1981), *reprinted in* Jt.App. at 170.

**20.** The agency's final response denying the petition specified that "in reviewing the petition for rulemaking purposes, we have not directed our attention" to "[c]laims that the present regulatory treatment of reconstituted milk is not in accordance with law." Letter from William T. Manley, *supra* note 19, at 175.